654 F.2d 688
 Roy M. CIRCLE and Wanda J. Circle, on behalf of themselves
and others similarly situated, Plaintiffs-Appellants,
v.
JIM WALTER HOMES, INC., a corporation, and Mid-State Homes,
Inc., a corporation and Jim Walter Corporation,
Defendants-Appellees.
Rayfield SMILEY and Evelyn C. Smiley, on behalf of
themselves and others similarly situated,
Plaintiffs-Appellants,
v.
MID-STATE HOMES, INC., a corporation, Defendant-Appellee.
 Nos. 79-1265, 79-1266.
 United States Court of Appeals,
Tenth Circuit.
 Argued Nov. 19, 1980.
Decided July 16, 1981.
 
 James M. Little, Oklahoma City, Okl. (John N. Goodman, Oklahoma City, Okl., with him on brief) of Ungerman, Conner, Little, Ungerman & Goodman, Oklahoma City, Okl., for plaintiffs-appellants.
 Lawrence A. G. Johnson, Tulsa, Okl., for defendants-appellees.
 Before McWILLIAMS and LOGAN, Circuit Judges, and CHRISTENSEN, District Judge*.
 LOGAN, Circuit Judge.
 
 
 1
 This appeal arises out of consolidated class actions brought in federal court under its diversity jurisdiction against Jim Walter Corporation and its subsidiaries Jim Walter Homes, Inc. and Mid-State Homes, Inc. The basic contention is that these defendants were liable for violations of Oklahoma's version of the Uniform Consumer Credit Code (UCCC) because negotiable instruments were taken to evidence class members' indebtedness in sales transactions in that state. A pretrial settlement resolved the claims of members of one of three classes of plaintiffs. All that remains to be determined by us with respect to Class III is the correctness of the trial court's ruling that settlements between Mid-State and Vernon and Vella Mae Gardner barred the Gardners' participation as members of Class III. The claims of Classes I and II were tried to the district judge who held for the defendants in each instance. See Circle v. Jim Walter Homes, Inc., 470 F.Supp. 39 (W.D.Okl.1979). To resolve the appeals by members of these two classes we must determine whether the defendants' sales to members of Class I, financed at annual interest rates of ten percent or less are "consumer credit sales" within UCCC coverage, and whether Class II's UCCC suits are barred because their transactions have been the subject of foreclosure actions which terminated in a judicial sale of their properties.
 
 
 2
 Jim Walter Corporation and its subsidiary Jim Walter Homes, Inc. built shell homes on real properties owned by the purchasers. When credit sales were made, negotiable notes were used to evidence the buyers' indebtedness and a mortgage was taken on the real estate to secure the debt. Mid-State Homes, Inc., another subsidiary, serviced the credit sales and, in the event of default, repossessed the homes and the accompanying land and sold them to new buyers, often also on credit arrangements. It is the taking of negotiable instruments that arguably violates Oklahoma's version of the UCCC, which provides "In a consumer credit sale or consumer lease, other than a sale or lease primarily for an agricultural purpose, the seller or lessor may not take a negotiable instrument other than a check as evidence of the obligation of the buyer or lessee." Okla.Stat.Ann. tit. 14A, § 2-403 (West 1972). With certain exceptions, a consumer credit sale includes the "sale of goods, services, or an interest in land." Okla.Stat.Ann. tit. 14A, § 2-104 (West 1972).
 
 
 3
 * Class I plaintiffs are those persons who purchased repossessed homes from Mid-State in transactions involving annual finance charges of ten percent or less. The trial court found that these sales were not "consumer credit sales" under the UCCC by virtue of Okla.Stat.Ann. tit. 14A, § 2-104(2)(b) (West 1972), which excludes
 
 
 4
 "a sale of an interest in land if the credit service charge does not exceed ten percent (10%) per year calculated according to the Actuarial Method on the unpaid balances of the amount financed on the assumption that the debt will be paid according to the agreed terms and will not be paid before the end of the agreed term."
 
 
 5
 Class members argue that this exclusion is inapplicable because Mid-State sold these properties by a contract for deed form and, since under Oklahoma law no equitable or legal interest in the land passes until full performance is accomplished there was no sale of an interest in land in the traditional sense.[1] They also argue that at the inception of each transaction the Jim Walters companies sold only shell homes, which they contend were "goods" under the UCCC and retained that characteristic even though Mid-State repossessed and resold them along with the underlying land.
 
 
 6
 We agree with the district court that these sales are excluded from UCCC coverage. When words in statutes are not defined, they are to be interpreted in their ordinary, everyday sense. Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 6, 67 S.Ct. 1047, 1050, 91 L.Ed. 1301 (1947); First Nat'l Bank & Trust Co. v. United States, 462 F.2d 908, 910 (10th Cir. 1972). In First National Bank, the Internal Revenue Service argued that no "purchase" of land as contemplated by Treas.Reg. § 1.165-3(a) could occur until the deed was delivered and the benefits and burdens of ownership passed. This Court rejected that argument, holding that regardless of when legal title to the land passes, the land is deemed to have been "purchased" upon the execution of a binding contract for deed.
 
 
 7
 This interpretation is consistent with Okla.Stat.Ann. tit. 14A, § 2-105(6) (West 1972), which provides that a sale of an interest in land "includes a lease in which the lessee has an option to purchase the interest and all or a substantial part of the rental or other payments previously made by him are applied to the purchase price." Clearly a lessee with an option to purchase does not have a present fee title, yet the Oklahoma legislature saw fit to treat such a transaction as a "sale of an interest in land" excludable under § 2-104(2)(b). Additionally, the official comment on section 104 explains that the ten percent exclusion was intended to exclude from coverage home mortgages, while retaining UCCC coverage of the high rate, "small loan" type of real estate loan. Thus, the framers appear to have chosen the ten percent interest line as a practical division point to differentiate between the two types of transactions as applied to home building or purchase.
 
 
 8
 The sales at issue here involved homes already built on land that was sold as part of the same transaction. Oklahoma recognizes the general property law rule, "that a building located upon a tract of land is a part of the land it occupies, and is therefore real property." Shelton v. Jones, 66 Okl. 83, 167 P. 458, 460 (1917). The Oklahoma Court of Appeals has determined in another case that the shell homes built by the defendants herein become part of land once they are erected. See Mid-State Homes, Inc. v. Martin, 465 P.2d 791 (Okl.App.1969). This holding disposes of the argument made by plaintiffs that the transactions are still "goods" within the contemplation of the UCCC. Therefore, no error was made in dismissing Class I members from this action.
 
 II
 
 9
 Class II comprises those plaintiffs who originally gave back negotiable instruments which arguably violated the UCCC. Each had defaulted and the property was lost by a suit of foreclosure followed by a judicial sale. The trial court held that the UCCC action brought by members of this class was barred by res judicata, reasoning that the foreclosure suit had determined the correct amount of finance charges due, which question would be addressed in any UCCC action.
 
 
 10
 The class members argue that their present UCCC action in no way resembles a foreclosure action. They assert that the causes of action involved in each case are not the same and the claim of a UCCC violation was not considered as an issue in the prior foreclosure action. Thus, they contend, normal res judicata principles do not bar this action. See Meyer v. Vance, 406 P.2d 996 (Okla.1965).
 
 
 11
 The same basic set of facts, of course, may constitute both a defense to a claim by an opposing party and the basis of a lawsuit against that party. In such cases, it is generally held that the failure of a defendant to raise the particular facts as a defense in a lawsuit brought against him does not preclude that defendant from thereafter suing for relief on the basis of these facts, regardless of who prevailed in the earlier suit. Moore v. Harjo, 144 F.2d 318, 322 (10th Cir. 1944) (interpreting the effect of a prior Oklahoma judgment); R. Casad, Res Judicata, 51-53 (1976); Restatement of Judgments § 58, Comment b (1942); Restatement (Second) of Judgments § 56.1, Comment b, (Tent. Draft No. 1 1973). Two exceptions to this rule exist, however. A subsequent claim may be barred by the operation of a compulsory counterclaim statute. Since Oklahoma does not have such a statute, Meyer v. Vance, 406 P.2d at 999, this exception is inapplicable. The second exception, sometimes termed the "common-law compulsory counterclaim rule," forecloses a subsequent claim "when allowance of a subsequent action would so plainly operate to undermine the initial judgment that the principle of finality requires preclusion of such an action." Restatement (Second) of Judgments § 56.1, Comment f. See also Moore v. Harjo, 144 F.2d at 322, R. Casad, supra, at 53.
 
 
 12
 In Moore v. Harjo, Harjo initially established his title in a quiet title action. Defendants to that action could have pleaded, in defense, their right to title by prescription. Instead, they chose to bring a subsequent quiet title action based on the prescription theory. This Court barred the subsequent suit for the reason that the very subject at issue, Harjo's right to title, had already been determined in his favor, and this solemn adjudication could not be nullified by a subsequent action.
 
 
 13
 "In some circumstances, the facts constituting the defense and also the affirmative cause of action are so intimately and inextricably intertwined with plaintiffs' cause of action, that a judgment for plaintiff necessarily adjudicates their nonexistence, even though not pleaded either by way of defense or cross-action; and in such circumstances, they cannot be subsequently pleaded, either in defense or affirmatively."
 
 
 14
 144 F.2d at 322.
 
 
 15
 Oklahoma courts have not yet considered whether a UCCC violation claim is barred by a prior foreclosure suit, nor, apparently, have any other courts. An analogous issue, whether prior foreclosure actions bar subsequent usury claims, has been addressed frequently by courts outside of Oklahoma. Most cases hold that the failure to raise usury as a defense in a foreclosure action bars a subsequent claim for usurious interest and penalties. Annot. 98 A.L.R. 1027 (1935). See Collister v. Inter-State Fidelity Bldg. & Loan Assoc., 44 Ariz. 427, 38 P.2d 626 (1934); Charles v. Davis, 62 N.H. 375 (1882); Bartholomew v. Yaw, 9 Paige Ch. 165 (N.Y.1841); Ryan v. Southern Bldg. & Loan Ass'n, 50 S.C. 185, 27 S.E. 618 (1897); Dallas Trust & Savings Bank v. Brashear, 39 S.W.2d 148 (Tex.Civ.App.1926); Henry v. Sansom, 2 Tex.Civ.App. 150, 21 S.W. 69 (1893).
 
 
 16
 The usury cases have followed a line of reasoning similar to that in Moore v. Harjo. See Charles v. Davis, 62 N.H. 375 ("If there be a bona fide legal process under which money is recovered, although not actually due, it cannot be recovered back, inasmuch as there must be some end to litigation," quoting Cadaval v. Collins, 4 A. & E. 858, 867); Ryan v. Southern Mut. Bldg. & Loan Ass'n, 50 S.C. 185, 27 S.E. at 619 ("since usury goes to defeat the recovery (of interest in the foreclosure action) in whole or in part, and is necessarily based upon, or connected with, the contract sued on, and in the affirmative proof upon the contract must be impliedly, but necessarily, negatived, a judgment defendant must be held estopped to affirm usury in the judgment debt in any subsequent suit involving the existence of such usury as a fact").
 
 
 17
 We believe that the principles espoused in these cases would be violated by allowing Class II members a present UCCC action. By virtue of the prior foreclosure actions which each member of the class suffered, it was determined that a certain amount of interest was properly owed. If the class members were allowed to proceed and were to successfully prosecute their present UCCC action, their remedy would be a recovery of the very interest their opponent has been held entitled to. This would nullify the prior adjudication. In addition, they could receive double damages on the interest they paid. We hold the present UCCC action is barred as a matter of res judicata.
 
 
 18
 We see no merit in Class II members' claim that they should be allowed relief against Jim Walters Corporation and Jim Walters, Inc., because only Mid-State was a party to the foreclosure suits. The record is scant but it appears Mid-State should be treated as being in privity with the Jim Walters companies. It was the subsidiary assignee for purposes of servicing the credit sales, and was not a bona fide purchaser free of the UCCC defenses the plaintiffs might have asserted. Further, we note that the Class II claims apparently arise only out of the complaint in Smiley v. Mid-State Homes, Inc., Civ-73-724-B, in which neither Jim Walters Corporation or Jim Walters, Inc. were sued.
 
 III
 
 19
 The final issue on appeal relates to the propriety of the trial court's dismissal of the suit of Vernon and Vella Mae Gardner, in which they sought to participate in the settlement with Class III members. The Gardners' original transaction in 1969 involved a negotiable note. In 1972 they defaulted on the note, and their account was refinanced by a new non-negotiable note. The Gardners apparently defaulted on this second note and foreclosure proceedings were instituted by Mid-State in a suit filed August 5, 1977, while the instant class actions were pending. That foreclosure was settled in January 1978 by Mid-State's payment of $3,000 pursuant to an offer made by the Gardners' attorney, just prior to the trial court's certification of the classes in February 1978.
 
 
 20
 The trial court held the refinancing extinguished by rescission the former negotiable note and all rights arising thereunder as if it had never existed, apparently on the theory that the new financing agreement fully covered the subject matter of the former contract and acted as a rescission and substitution for it. See Rose v. Roberts, 195 Okl. 687, 161 P.2d 851 (1945). The Gardners claim that they did not understand the effect of signing the non-negotiable note, that they were not restored to status quo by the rescission, nor was such intended, and that there can be no partial rescission of a contract. (Apparently, they additionally contend that at most a partial rescission was effected.) They produced no facts to support these contentions, and the record is devoid of any evidence relating to the matter. The trial court consequently rejected their contention and we have no basis for holding the trial court's decision on this matter was clearly erroneous. Accepting that decision, the rescission operated to extinguish any rights arising by virtue of the rescinded contract. See Berland's Inc. v. Northside Village Shopping Center, Inc., 447 P.2d 768 (Okla.1968). This being the case, it is unnecessary for us to consider whether the later foreclosure settlement agreement between Mid-State and the Gardners also extinguished the Gardners' rights, for they had already forfeited their UCCC cause of action.
 
 
 21
 AFFIRMED.
 
 
 
 *
 Honorable A. Sherman Christensen of the United States District Court for the District of Utah, sitting by designation
 
 
 [1]
 Class members surely did not intend to argue that no sale whatsoever occurred since a "consumer credit sale" requires a sale of something