**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LENOX MACLAREN SURGICAL
CORPORATION,

      Plaintiff – Appellant /
      Cross-Appellee,

v.

MEDTRONIC, INC.; MEDTRONIC
SOFAMOR DANEK, INC.; MEDTRONIC
PS MEDICAL, INC., d/b/a Medtronic
Neurologic Technologies; MEDTRONIC
SOFAMOR DANEK CO., LTD.,

      Defendants – Appellees /
      Cross-Appellants.

Nos. 15-1500
and 16-1012

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:10-CV-02139-MSK-NYW)**
_____

Derek T. Ho, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C.
(G. Stephen Long, Nicole A. Westbrook, Jones & Keller, Denver, Colorado, with him on
the briefs), for Plaintiff-Appellant/Cross-Appellee.

Mark C. Fleming, Wilmer Cutler Pickering Hale and Dorr, LLP, Boston, Massachusetts
(Ari Holtzblatt, Ryan McCarl, Wilmer Cutler Pickering Hale and Dorr, LLP,
Washington, D.C., and Steven Zager, Akin Gump Strauss Hauer & Feld LLP, New York,
New York, with him on the briefs), for Defendants-Appellees/Cross-Appellants.
_____

Before **LUCERO**, **HARTZ**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.

_____

## I.    INTRODUCTION

In 2010, Lenox MacLaren Surgical Corporation ("Lenox") sued several related corporations—Medtronic, Inc.; Medtronic PS Medical, Inc. ("PS Medical"); Medtronic Sofamor Danek, Inc. ("MSD, Inc."); and Medtronic Sofamor Danek Co. Ltd. ("MSD Japan") (collectively, "Defendants")—for monopolization and attempted monopolization in violation of § 2 of the Sherman Act. 15 U.S.C. § 2. Lenox alleged that Defendants engaged in illegal activity to advance a coordinated, anticompetitive scheme in which a related non-party, Medtronic Sofamor Danek USA, Inc. ("MSD USA"), also participated. Lenox had sued MSD USA in 2007 on claims arising from the same set of facts.

This appeal, the third in this case, challenges the district court's disposition of Defendants' second motion for summary judgment, which claimed that Lenox could not prove the elements of its antitrust claims against any of the named Defendants individually, and that Defendants cannot be charged collectively with the conduct of MSD USA or of each other. They also argued that the doctrine of claim preclusion bars Lenox's claims, in light of the prior proceeding against MSD USA. The district court granted summary judgment, holding that because Lenox could not establish each of the elements of an antitrust claim against any one defendant, or establish a conspiracy among them, Lenox's claims fail as a matter of law.

Lenox now appeals, alleging several errors in the district court's substantive analysis of Lenox's § 2 claims. Defendants cross-appeal to preserve their argument that,

2

even if the district court erred in resolving Lenox's antitrust claims, we should affirm on the alternative basis of claim preclusion.

For the reasons set forth below, we conclude that Lenox raised a viable antitrust theory, but we decline to address the merits of Lenox's antitrust claims because to the extent Defendants can be held liable under Lenox's theory of antitrust liability, they are in privity with MSD USA. As a result, Lenox's claims are barred by the claim preclusion arm of res judicata. We therefore affirm the district court's grant of summary judgment for Defendants on that basis.

## II.   BACKGROUND

The parties' dispute traces back to 2000, when Lenox entered into an agreement to sell bone mills—surgical tools that Lenox manufactures—through MSD USA. The arrangement with MSD USA did not go as Lenox had hoped: MSD USA initiated a recall of Lenox's bone mills, and one of the present defendants, PS Medical, began to manufacture and sell its own bone mills to former users of Lenox's product. As we explain in greater detail below, it is this failed arrangement that forms the factual nucleus of this case.

Before proceeding further into the background recitation, we pause to clarify the identities of, and relationships among, the several Medtronic entities involved in this dispute. In our decisions resolving the two prior appeals in this case, and in Lenox's various filings in the district court, the four named defendants often are referenced as one: in *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.* (*Lenox I*), 449 F. App'x 704 (10th Cir. 2011) (unpublished), they are "the Medtronic Defendants"; and in *Lenox*

3

*MacLaren Surgical Corp. v. Medtronic, Inc.* (*Lenox II*), 762 F.3d 1114 (10th Cir. 2014), and many of Lenox's filings, they are "Medtronic." For purposes of assessing the district court's order and the issues raised in this appeal, however, it is important to keep the actions of the various entities separate.

### A. *The Medtronic Entities*

Medtronic, Inc. is the highest-tier Medtronic entity named as a defendant in this case and is the parent or grandparent corporation of the other three defendants, as well as non-party MSD USA, the Medtronic entity Lenox sued in the prior litigation and arbitration. PS Medical and MSD, Inc. are wholly owned subsidiaries of Medtronic, Inc.; and MSD Japan and MSD USA are wholly owned subsidiaries of MSD, Inc. The relevant corporate structure thus looks like this:

- Medtronic, Inc. (defendant)
    - MSD, Inc. (defendant)
        - MSD Japan (defendant)
        - MSD USA (*non-party*)
    - PS Medical (defendant)

### B. *Factual History[1]*

Lenox was one of the first companies to design and produce a bone mill, which is a medical tool that grinds bone into fragments for use in spinal-fusion surgeries. In April 2000, Lenox entered into a five-year Exclusive Supply and License Agreement (the

---

[1] The underlying facts of this case were presented in detail in *Lenox I* and *Lenox II*. We reiterate here only the information needed to understand the issues raised in this appeal.

"license agreement" or the "agreement") with MSD USA. The agreement granted MSD USA the exclusive right to purchase Lenox's bone mills, rebrand them, and distribute them. In exchange, MSD USA promised to "refrain from purchasing [bone mills] from any third party or from producing [bone mills] itself," and agreed to certain minimum purchase requirements. Specifically, the agreement required MSD USA to purchase 500 bone mills in the first year and to purchase 100 bone mills per quarter thereafter to maintain the exclusivity of its distribution rights. Among other additional provisions, the agreement contained a dispute resolution clause under which the parties agreed to arbitrate "any dispute arising out of or relating to" the agreement.

MSD USA made the initial purchase of 500 bone mills in the first year but did not purchase any bone mills after that. Lenox therefore notified MSD USA in 2001 that its distribution rights were no longer exclusive.

MSD USA sold some of the 500 Lenox bone mills but distributed the rest through a "loaner program," whereby doctors and hospitals could use the bone mills for free while MSD USA retained ownership of them. Under this program, the bone mills were returned to MSD USA after each surgery to be sterilized and redistributed for reuse. MSD USA sold or loaned some of the bone mills to MSD Japan, which marketed them to doctors and hospitals in Japan.

In November 2002, after MSD USA had purchased the 500 Lenox bone mills, PS Medical began developing a pneumatic bone mill of its own. This device proved commercially unsuccessful, and in 2006, PS Medical began developing a new electric bone mill called the Midas Rex.

5

Between 2000 and 2006, Lenox and MSD USA received only one complaint about Lenox's bone mill—an April 2003 report from an MSD Japan representative stating that a piece of metal was found in the ground bone fragments produced by the device. Lenox reviewed the report, determined the malfunction was caused by user error, advised MSD USA of its determination, and did not hear anything further about the incident from MSD USA.

Then, on September 4, 2006, an MSD Japan representative generated three new complaints. Each complaint was logged on a "Reported Event Form," and included an identical event description: "Metal fragments were mixed with bone fragments (New product)." The reported complaints allegedly came from three Japanese surgeons, but when Lenox located these surgeons they denied lodging the complaints.[2] The Reported Event Form, which appears to be a standard, fill-in-the-blank document, contains the following stock instruction: "Please complete all applicable sections and return to MSD Global." There is no Medtronic entity known as MSD Global.

MSD USA received these complaints and, in October 2006, initiated a recall of Lenox's bone mill. But even before it initiated the recall, in mid-to-late September, MSD USA employees began taking steps to replace Lenox's bone mills loaned to physicians with PS Medical's Midas Rex bone mill. PS Medical started selling the Midas Rex in January 2007. It specifically targeted prior users of the Lenox bone mill, using MSD

---

[2] In light of this development, Defendants, which initially had asserted the complaints were made to MSD USA by the Japanese surgeons, changed their story and claimed instead that the complaints came from MSD Japan representatives and other third-party witnesses.

USA's customer list. As we detailed in *Lenox II*, PS Medical went on to attain a monopoly in the market for surgical bone mills. 762 F.3d at 1123–24.

### C. *Procedural History*

### 1. Prior Proceeding Against MSD USA

Lenox sued MSD USA in 2007, alleging that MSD USA entered into the license agreement, engaged in the loaner program, and initiated the recall, all for the purpose of creating market demand for a mechanical bone mill, clearing the market of Lenox's competing bone mill, and then filling that market vacuum with the Midas Rex bone mill. Specifically, Lenox asserted claims for patent infringement, violation of the Colorado Consumer Protection Act, and trade libel. MSD USA moved to compel arbitration under the terms of the license agreement. The district court granted the motion, and the lawsuit was administratively closed and stayed pending the outcome of the arbitration.

Once in arbitration, Lenox filed an Amended Arbitration Demand Statement, adding, among others, a claim for intentional interference with Lenox's prospective economic relations. After an evidentiary hearing, the arbitral panel rejected most of Lenox's claims, concluding, among other things, that the loaner program and production of the Midas Rex bone mill did not breach the license agreement, that MSD USA did not breach the covenant of good faith and fair dealing, and that the loaner program did not infringe Lenox's patent. The arbitrators did determine, however, that MSD USA's recall of the bone mills was "intentional and wrongful," and that MSD USA thereby intentionally interfered with Lenox's prospective business relations. The arbitrators

7

concluded MSD USA was liable to Lenox for $246,000 in damages, plus prejudgment interest, and issued an award to that effect.

MSD USA paid Lenox the damages owed, and the parties thereafter agreed to administratively reopen the district court proceeding and to dismiss the case with prejudice.

### 2. This Case

In September 2010, Lenox filed the present case against Defendants, alleging monopolization and attempted monopolization in violation of § 2 of the Sherman Act, as well as state law claims that Lenox later voluntarily dismissed.

Defendants moved to compel arbitration based on the license agreement between Lenox and MSD USA. The district court denied the motion, and a panel of this court affirmed. *Lenox I*, 449 F. App'x at 705. The panel determined that, while the agreement between Lenox and MSD USA "is factually significant to [Lenox]'s antitrust claims because [it] provided the opportunity for the Medtronic Defendants to engage in the anticompetitive conduct alleged," the agreement "does not form the legal basis for [Lenox]'s claims" because "[Lenox's] claims do not depend on whether either MSD USA's or the Medtronic Defendants' conduct was proper under the [a]greement." *Id.* at 710.

Based on limited discovery conducted on remand, Defendants moved for summary judgment on both of Lenox's § 2 claims. The district court granted the motion, concluding Lenox could not establish the relevant-market, monopoly-power, or harm-to-competition aspects of those claims. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,

8

No. 10-cv-02139-RPM-BNB, 2013 WL 3179204, at *3–7 (D. Colo. June 21, 2013).

Lenox appealed, and a separate panel of this court reversed. *Lenox II*, 762 F.3d at 1116–17. The panel concluded Lenox's evidence was sufficient to create a jury question as to each element of monopolization and attempted monopolization. *See id.* at 1119–30. Although Defendants argued MSD USA alone was responsible for the recall of Lenox's bone mill, the panel declined to affirm summary judgment on that basis because the parties had not yet conducted discovery on Defendants' involvement. *Id.* at 1128. The panel also declined to consider Defendants' claim-preclusion[3] argument because, although Defendants had raised it in an earlier motion to dismiss, they had not renewed the argument in their motion for summary judgment. *Id.* at 1118.

After conducting further discovery on remand, the district court granted Defendants' request for leave to file a second motion for summary judgment. As relevant here, Defendants argued they were entitled to judgment on both of Lenox's claims because (1) "Lenox cannot prove anticompetitive conduct by any individual Defendant and . . . all of the conduct forming the basis of Lenox's monopoly claims are actions taken solely by non-party [MSD] USA"; and (2) Lenox's claims are barred by the doctrine of claim preclusion. Ultimately, the district court agreed with Defendants' first argument and granted summary judgment in their favor on that basis alone. Lenox

---

[3] Although the parties used the term "res judicata" in the *Lenox II* appeal and use it again in this appeal, we employ the more descriptive term "claim preclusion" in this opinion. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984); *Wilkes v. Wyo. Dep't of Emp't Div. of Labor Standards*, 314 F.3d 501, 504 n.1 (10th Cir. 2002).

appealed, and Defendants cross-appealed to preserve their argument that we can affirm on the alternate basis of claim preclusion.

## III.  DISCUSSION

Lenox argues the district court erred in granting summary judgment on its § 2 monopolization and attempted monopolization claims. *See* 15 U.S.C. § 2. Specifically, Lenox asserts the court failed to analyze these claims under the proper legal theory and that, viewed through the lens of this theory, the record evidence is sufficient to establish—or create triable issues of fact as to the existence of—all the elements of each claim. We review de novo the district court's grant of summary judgment, *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016), and its determination of the applicable legal standard, *see Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).

Defendants argue on cross-appeal that even if the district court erred in disposing of Lenox's antitrust claims on the merits (which Defendants do not concede), we nonetheless should affirm the grant of summary judgment on the alternative basis that Lenox's claims are barred by the doctrine of claim preclusion. Where, as here, claim preclusion was adequately raised below, we may consider it as an alternative basis for affirmance even if the district court did not base its decision on that doctrine. *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005). If the relevant facts are undisputed, the application of preclusion principles to those facts is a question of law that we consider de novo. *See Pelt v. Utah*, 539 F.3d 1271, 1280–81 (10th Cir. 2008); *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997).

We begin with Lenox's substantive antitrust claims. To properly assess whether, as Lenox contends, the district court erred in disposing of these claims, we must first consider Lenox's assertions that it set forth at summary judgment a legal approach other than those considered in the district court's order and that this alternative approach is legitimate. For the reasons set forth below, we conclude that Lenox advanced a viable, if somewhat unusual, antitrust theory. But we affirm the district court's grant of summary judgment because even if we were to conclude Lenox's substantive theory of the case is correct on the merits, it necessarily follows that Defendants and MSD USA are in privity and that Lenox's claims are precluded.

### A. *Lenox's Sherman Act Claims*

Lenox argues the district court erred by construing its claims of monopolization and attempted monopolization as a claim of conspiracy to monopolize, which requires proof of an agreement among the co-conspirators. *See Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756 (10th Cir. 1999) (discussing the elements of each claim). Lenox maintains instead that Defendants are a "single enterprise" for purposes of antitrust analysis. As a result, Lenox claims it was entitled to pursue non-conspiracy § 2 claims based on Defendants' aggregate conduct and was not required to prove the existence of an agreement among them. According to Lenox, its burden of establishing any individual defendant's liability required showing only that the defendant's conduct played a "role" in the overall anticompetitive scheme perpetrated by the enterprise as a whole.

For their part, Defendants acknowledge that the district court considered a conspiracy rationale but contend it did so as an alternative theory of liability, in addition

to considering actual- and attempted-monopolization theories. Defendants argue any error on the part of the district court in addressing conspiracy is immaterial because the court also determined—correctly, in Defendants' view—that Lenox cannot prove any one defendant engaged in anticompetitive conduct and therefore cannot establish § 2 liability under any theory.

It is unnecessary to resolve the parties' dispute over the precise nature and scope of the district court's analysis. Regardless of whether the district court considered only a conspiracy rationale, or also assessed each defendant's conduct individually under the alternative tests Defendants deem appropriate, Lenox fairly presented a single-enterprise theory of antitrust liability, which the district court did not consider. But that oversight is understandable in light of the novelty of the theory as well as Lenox's confusing attempt to toe the line between proving antitrust liability, while avoiding preclusion. As an issue of first impression for this court, we conclude that Lenox's single-enterprise theory is viable as a general matter. But the success of the theory here relies on an identity of purpose among Defendants and MSD USA that bars Lenox's action under the doctrine of claim preclusion. To explain our reasoning, we begin with a discussion of single-enterprise monopolization and then address the impact of that analysis on the application of claim-preclusion principles to the facts of this case.

### 1. Unilateral and Concerted Action Under the Sherman Act

At the root of the substantive issues implicated here is the Sherman Act's oft-emphasized distinction between independent and concerted conduct. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189–91 (2010); *Cohlmia v. St. John Med. Ctr.*,

12

693 F.3d 1269, 1280 (10th Cir. 2012). Section 1 of the Sherman Act—which prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1—"applies only to concerted action that restrains trade." *Am. Needle*, 560 U.S. at 190. By contrast, § 2 of the Sherman Act—which makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize any part of the trade or commerce," 15 U.S.C. § 2—"covers both concerted and independent action, but only if that action 'monopolizes' . . . or 'threatens actual monopolization,'" *Am. Needle*, 560 U.S. at 190 (alteration and citations omitted), or at least is intended to monopolize, *see Auraria Student Housing at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1233 (10th Cir. 2016). *See also Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1545 (10th Cir. 1995) ("Section 1 of the Act focuses on the anticompetitive behavior of joint actors . . . [while] [s]ection 2 applies to unilateral as well as joint action . . . ." (citation omitted)).

Thus, like § 1, § 2 embodies a conspiracy claim that requires "concerted action by a plurality of actors." *See Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1232 (10th Cir. 2003) (section 1); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1028 (10th Cir. 2002) (section 2). The elements of a § 2 conspiracy claim are "conspiracy, specific intent to monopolize, and overt acts done in furtherance of the conspiracy." *Full Draw Prods.*, 182 F.3d at 756 (citation omitted). Unlike § 1, however, § 2—through its prohibitions on monopolization and attempted monopolization—also "can be violated by a single economic unit without requiring any contract, combination, or conspiracy." *Cohlmia*, 693 F.3d at 1280. The elements of a § 2 monopolization claim are "(1) monopoly power in

13

the relevant market; (2) willful acquisition or maintenance of this power through exclusionary conduct; and (3) harm to competition." *Lenox II*, 762 F.3d at 1119. And the elements of a § 2 attempted monopolization claim are (1) "predatory or anticompetitive conduct," (2) "a specific intent to monopolize," and (3) "a dangerous probability of achieving monopoly power." *Id.* at 1129.

These basic principles illuminate the dispute in this case. Lenox claimed that Defendants attempted to monopolize, and succeeded in monopolizing, the bone-mill market in violation of § 2. Seeing Defendants as four separate companies and noting MSD USA's critical involvement in the conduct undergirding Lenox's claims, however, the district court concluded that Lenox could not establish § 2 monopolization or attempted-monopolization liability as to any individual defendant, because no single defendant's conduct satisfied all the respective elements of those claims. The district court then concluded Lenox had two other options: (1) it could succeed on its actual- and attempted-monopolization claims by proving either that Defendants controlled MSD USA's conduct or shared an "alter ego" relationship with MSD USA; or (2) it could instead succeed on a conspiracy-to-monopolize theory if it could prove Defendants conspired, among themselves and with MSD USA, to monopolize the bone-mill market.

Although the district court's reasoning is understandable, we conclude that Lenox actually raised a separate, single-enterprise theory, which has rarely been presented in federal antitrust litigation and has never been acknowledged by this court. In light of certain longstanding, if nuanced, legal principles regarding the concept of concerted action under the Sherman Act, as well as the obverse corollaries of those principles, we

now recognize the viability of such a theory in the abstract. We ultimately affirm on claim-preclusion grounds the district court's rejection of Lenox's claims, but we explain the antitrust concepts that sustain Lenox's single-enterprise theory to place our subsequent preclusion discussion in context.

## 2. *Copperweld* and its Corresponding Principles

Our starting point is the Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.*, which involved a plaintiff manufacturer's claim that its competitor and the competitor's parent corporation had conspired in violation of § 1 of the Sherman Act. 467 U.S. 752, 756–58 (1984). A jury found the parent and subsidiary defendants liable under § 1, and the Seventh Circuit affirmed under the so-called "intra-enterprise conspiracy" doctrine, which permitted § 1 liability for the coordinated acts of a parent and its wholly owned subsidiary "when there is enough separation between the two entities to make treating them as two independent actors sensible." *Id.* at 758–59 (internal quotation marks omitted). The Supreme Court granted certiorari and reversed, abrogating the intra-enterprise conspiracy doctrine in the process.

The Court reiterated the Sherman Act's basic distinction between unilateral and concerted conduct, and explained how the rationale underlying that distinction logically supported the then-already-accepted notions that coordinated activity among a corporation's employees or among a corporation and its unincorporated divisions does not violate § 1. *Id.* at 767–71. The Court then concluded that, for the same reasons, the coordinated acts of a corporation and its wholly owned subsidiary also do not violate § 1. *Id.* at 771–74. Among other things, the Court stressed that

15

[a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided and determined not by two separate corporate consciousnesses, but one. . . . If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

Indeed, the very notion of an "agreement" in Sherman Act terms between a parent and its wholly owned subsidiary lacks meaning. A § 1 agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." [*Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946).] But in reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design."

*Id.* at 771. For these reasons, the Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise," *id.*; *see also id.* at 772 n.18 ("[T]he parent and the subsidiary must be viewed as a single economic unit."), such that the parent and subsidiary are legally incapable of conspiring in violation of § 1, *id.* at 777. The Court noted, however, that its holding would not immunize corporations and their wholly owned subsidiaries from antitrust liability because "the enterprise [remains] fully subject to § 2 of the Sherman Act." *See id.*

Although *Copperweld* addressed the specific relationship between a parent company and its wholly owned subsidiary, "[l]ower courts have since applied *Copperweld*'s reasoning (sometimes referred to as the 'single-entity' rule) to a broader variety of economic relationships." *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir. 2005); *see also City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 274 (8th Cir. 1988) ("[T]he logic of *Copperweld* reaches beyond its bare result . . . ."). As relevant here, the majority of our

16

sister circuits (indeed, every circuit to address the question), as well as our colleagues on the district courts of this circuit, have held that *Copperweld*'s "rationale and underlying policy apply with equal force to sister corporations that are wholly owned subsidiaries of the same parent," and that such subsidiaries, along with their parent, constitute a single economic enterprise for antitrust purposes.[4] *Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244, 249–50 (1st Cir. 2012); *accord, e.g.*, *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir. 2008); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003); *Davidson & Schaaff, Inc. v. Liberty Nat'l Fire Ins. Co.*, 69 F.3d 868, 871 (8th Cir. 1995) (citing *Copperweld* for the proposition that "two subsidiaries of the same parent cannot conspire," but applying it in the context of a civil conspiracy claim); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1133–34 (3d Cir. 1995); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 146 (4th Cir. 1990); *Hood v. Tenneco Tex. Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir. 1984); *Hear-Wear Techs., LLC v. Oticon, Inc.*, No. 07-CV-0212-CVE-SAJ, 2007 WL 4379714, at *4–5 (N.D. Okla. Dec. 12, 2007); *Med. Supply Chain, Inc. v. US Bancorp, NA*, No. 02-2539-CM, 2003 WL 21479192, at

---

[4] "Simply stated, federal courts have consistently applied *Copperweld* to preclude the finding of antitrust conspiracies within a corporate family . . . ." *Horst v. Laidlaw Waste Sys., Inc.*, 917 F. Supp. 739, 742 (D. Colo. 1996); *see also* 7 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1464f, at 225 & n.33 (3d ed. 2008) (stating that "[t]he post-*Copperweld* decisions are virtually unani[m]ous" on this point); 1 A.B.A. Section of Antitrust Law, *Antitrust Law Developments* 27 (5th ed. 2002) [hereinafter *Antitrust Developments*] ("Most courts have held that the *Copperweld* rule extends to conspiracies between sister corporations.").

\*3 (D. Kan. June 16, 2003); *H.R.M., Inc. v. Tele-Commc'ns, Inc.*, 653 F. Supp. 645, 647–48 (D. Colo. 1987).

While we have not yet expressly addressed *Copperweld*'s application in the sister-subsidiary context, our precedent does not point to a contrary result. Indeed, we have endorsed this extension of *Copperweld* implicitly. In *Medical Supply Chain, Inc. v. US Bancorp, NA*, 112 F. App'x 730 (10th Cir. 2004) (unpublished), a panel of this court reviewed a district court order dismissing a plaintiff's § 1 and § 2 conspiracy claims on the ground that, under *Copperweld*, the defendants—a parent and several of its wholly owned subsidiaries—were a single enterprise incapable of conspiring. *Med. Supply Chain*, 2003 WL 21479192, at \*3, \*5. Although the panel did not itself explicate the result, it "conclude[d] that the district court correctly decided th[e] case" and, reviewing the district court's decision de novo, affirmed "for the same reasons stated by the district court." *Med. Supply Chain*, 112 F. App'x at 731.

The only other case in which we have touched on the single-enterprise theory is *Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999). There, we rejected the plaintiffs' attempt "to extend *Copperweld* to hold that a subsidiary and its parent, or a subsidiary and a sister subsidiary, can be considered one entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, *even where there is no evidence that both were involved in the challenged conduct*." *Id.* at 857 (emphasis added). We reasoned this extension was unwarranted because "the [*Copperweld*] Court held only that 'the *coordinated* activity' of a parent and subsidiary must be viewed as that of a single enterprise for § 1 purposes." *Id.* (quoting *Copperweld*, 467 U.S. at 771 (emphasis

18

added)). Because in *Intracorp* there was "no evidence of any involvement by [the defendant's] parent or sister corporations," we concluded that *Copperweld*'s single-entity rule was inapplicable. *Id.* at 857 n.12 (citation omitted). But we did not address (much less reject) the notion that, *with* evidence of involvement, sister corporations and their parent should be treated as a single entity for antitrust purposes.

Thus, nothing in our existing precedent would prevent Lenox from pursuing a theory consistent with the majority view that *Copperweld* supports treating the coordinated acts of sister subsidiaries wholly owned by the same parent as those of a single enterprise, such that the subsidiaries are incapable of conspiring under § 1 of the Sherman Act. Courts and commentators have long agreed that the logic of this view is plain. *See, e.g.*, *Advanced Health-Care Servs.*, 910 F.2d at 145–47 (explaining rationale; collecting early cases); Stephen Calkins, Copperweld *in the Courts: The Road to* Caribe, 63 Antitrust L.J. 345, 351 (1995) (characterizing the notion that "sister corporations are incapable of conspiring in violation of the Sherman Act" after *Copperweld* as an "obvious conclusion, which courts quickly grasped"); *see generally* Phillip Areeda, *Intraenterprise Conspiracy in Decline*, 97 Harv. L. Rev. 451 (1983). In the words of the preeminent antitrust treatise:

> [A]ll of the reasoning of the Court [in *Copperweld*] . . . equates sibling corporations with subsidiaries. The total unity of the corporate enterprise is equally reflected in both. In refusing to make corporate form determinative and in refusing to treat wholly owned corporations differently from unincorporated divisions, the *Copperweld* holding also denies conspiratorial capacity to sibling corporations' dealings with each other.

7 Areeda & Hovenkamp, *supra*, ¶ 1464f, at 225. We agree.

19

In addition, we also conclude that *Copperweld*'s reasoning with respect to § 1 applies equally to § 2—for the same reasons single-enterprise entities cannot conspire in violation of the former provision, they cannot conspire in violation of the latter. Although neither the Supreme Court nor this circuit has expressly extended *Copperweld*'s holding to § 2, the rationale for doing so is obvious. A § 2 conspiracy claim, like a § 1 claim, requires concerted activity between at least two participants. *See Lantec*, 306 F.3d at 1028. It would be anomalous to hold that wholly related corporations constitute a single entity, and so cannot form a conspiracy, for purposes of § 1, but that the same corporations constitute separate entities, and so can form a conspiracy, for purposes of § 2. Not surprisingly, every court to address the question has held that affiliated entities which must be treated as a single enterprise for purposes of § 1 also must be treated as a single enterprise for purposes of § 2.[5] *See, e.g.*, *Vollrath Co. v. Sammi Corp.*, 9 F.3d 1455, 1459, 1463 (9th Cir. 1993); *Advanced Health-Care Servs.*, 910 F.2d at 150; *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 573–74 (6th Cir. 1986); *Ritz Camera & Image, LLC v. SanDisk Corp.*, 772 F. Supp. 2d 1100, 1110–11 (N.D. Cal. 2011); *D'Last Corp. v. Ugent*, 863 F. Supp. 763, 769 (N.D. Ill. 1994); *H.R.M., Inc.*, 653 F. Supp. at 648. Commentators, too, concur. *See, e.g.*, 7 Areeda & Hovenkamp, *supra*, ¶ 1464g, at 227 ("Affiliated corporations that constitute a single entity so as to be incapable of conspiring

---

[5] The district court here cited *Growers 1-7 v. Ocean Spray Cranberries, Inc.*, No. 12-12016-RWZ, 2014 WL 1764533 (D. Mass. May 2, 2014), as having "reject[ed] [the] argument that [the] First Circuit has extended *Copperweld* to monopoly cases." To be sure, the *Growers* court rejected a party's characterization of a prior First Circuit case as having extended *Copperweld* to § 2 claims and clarified that the cited case did not address the issue. *Id.* at *7 n.11. But the *Growers* court then decided for itself that *Copperweld*'s reasoning *does* apply in the context of § 2. *Id.* at *7.

for purposes of Sherman Act § 1 are equally incapable of conspiring to monopolize under Sherman Act § 2."); *Antitrust Developments*, *supra*, at 310 ("*Copperweld*'s holding . . . applies to conspiracies to monopolize." (footnote omitted)). Moreover, in the same case in which a panel of this court implicitly approved extending *Copperweld* to sister subsidiaries, the panel also implicitly approved extending it to § 2 conspiracy claims. *See Med. Supply Chain*, 2003 WL 21479192, at *5 (dismissing § 2 conspiracy claim for same reasons it dismissed § 1 claim), *aff'd* 112 F. App'x at 731 (affirming "for the same reasons stated by the district court").

Applied to the case at hand, the foregoing discussion leads naturally to several related conclusions. For one, we agree with Lenox that Defendants—three of which (MSD Japan, PS Medical, and MSD, Inc.) are wholly owned subsidiaries of the fourth (Medtronic, Inc.)—should be treated as a single enterprise for purposes of the Sherman Act's conspiracy prohibitions.[6] *See, e.g.*, *Freeman*, 322 F.3d at 1148 ("Where there is substantial common ownership, . . . individual firms function as an economic unit and are generally treated as a single entity."). Thus, Lenox could not have pursued a conspiracy claim against Defendants. It also follows that Lenox was permitted under the antitrust laws to assert § 2 monopolization and attempted monopolization claims—while a single corporate enterprise is unable to engage in the concerted action necessary for conspiracy liability, its unitary action remains "fully subject to § 2 of the Sherman Act." *See*

---

[6] Although MSD Japan is actually a wholly owned subsidiary of MSD, Inc., and thus a sub-subsidiary or "grandchild" of Medtronic, Inc., Defendants have not argued that this distinction should affect our analysis. *Cf. Horst*, 917 F. Supp. at 742 ("[W]hether Defendants are sister corporations or one is the wholly owned 'grandchild' of the other, they are [a single entity] incapable of conspiring under the Sherman Act.").

21

*Copperweld*, 467 U.S. at 777; *see also, e.g.*, *Gonzalez-Maldonado*, 693 F.3d at 250 ("Of course, a [single enterprise] can violate section 2 of the Sherman Act, which prohibits attempts to monopolize and monopolization[.]"); *Advanced Health-Care Servs.*, 910 F.2d at 146–50 (affirming dismissal of plaintiff's § 1 and § 2 conspiracy claims against sister-corporation defendants under *Copperweld*, but reversing dismissal of monopolization and attempted monopolization claims against same defendants); *Climax Molybdenum Co. v. Molychem, L.L.C.*, 414 F. Supp. 2d 1007, 1012–13 (D. Colo. 2005) (rejecting parent and subsidiary defendants' argument that plaintiff's § 2 monopolization and attempted monopolization claims were really a § 2 conspiracy claim barred by *Copperweld*, and holding plaintiff could proceed with its claims).

Similarly, and although *Copperweld* did not expressly reach this issue, we conclude *Copperweld*'s reasoning necessarily denounces Defendants' belief that Lenox could directly establish its non-conspiracy § 2 claims only by proving that "*specific* Defendants" independently satisfied each necessary element of the claims. (Emphasis added.) Rather, in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim. *Cf.* 7 Areeda & Hovenkamp, *supra*, ¶ 1464g, at 227 ("[A] single entity can violate § 2 if the prerequisites for monopolization or attempted monopolization are met[.]"). Stated another way, the related entities' coordinated conduct must be treated as the unitary conduct of the single enterprise which together they form, and it is that aggregated conduct which must be scrutinized under § 2.

22

To hold otherwise—to require that each affiliated defendant independently satisfy every element in order to be held liable—would be difficult to justify in light of the Supreme Court's direction that the "anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine," in part because the enterprise they form "is fully subject to § 2 of the Sherman Act." *Copperweld*, 467 U.S. at 776–77. And it would all but eviscerate the statute with respect to sophisticated competitors. So long as a corporation spread its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability, it could unlawfully monopolize with impunity. We think *Copperweld* forecloses this result.

Although we have found no decision that elucidates this corollary of *Copperweld*'s reasoning, numerous courts have followed it in practice. *See, e.g.*, *Vollrath*, 9 F.3d at 1460–62 (concluding affiliated defendants were single entity incapable of conspiring for purposes of § 1 and § 2 conspiracy claims; analyzing them as "an integrated entity" for purposes of attempted monopolization claim); *City of Mt. Pleasant*, 838 F.2d at 279–80 (concluding members of cooperative were single entity incapable of conspiring; analyzing whether cooperative itself satisfied elements of monopolization claims); *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 611–14 (6th Cir. 1987) (similar); *Horst*, 917 F. Supp. at 742–45 (similar). Indeed, the same can be said of our decision in *Lenox II*, where we determined a jury could find that the overall course of conduct at issue in this litigation violated § 2 even though we left unanswered the question of each defendant's specific role in that conduct. *See* 762 F.3d at 1117,

23

1119–29. Thus, while we agree with Defendants that none of them individually satisfied the elements of a monopolization or attempted monopolization claim, we do not agree that the inquiry into their liability ends there.

### 3. The Requirement of Coordinated Activity

But nothing in our prior discussion should be read to suggest that a corporation can be held liable under § 2 for the anticompetitive conduct of one or more related entities, merely by virtue of its place in the same corporate family. As this court has previously indicated, *Copperweld* "held only that 'the *coordinated* activity' of [related entities] must be viewed as that of a single enterprise." *See Intracorp*, 179 F.3d at 857 (quoting *Copperweld*, 467 U.S. at 771 (emphasis added)). Thus, an affiliated corporation cannot be held liable as a part of the enterprise "where there is no evidence that [the corporation] w[as] involved in the challenged conduct." *See id.* So although we agree that Lenox was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, Lenox was still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise. But neither this circuit nor any other has provided a clear answer to the question of what level of involvement is sufficient to meet that burden. And here, the parties' briefs and the district court's order offer different options for formulating that test.

To begin, the district court noted that, irrespective of its own conduct, an affiliated corporation could be deemed automatically or vicariously liable for the conduct of one or more related corporations under a veil-piercing, alter ego, or respondeat superior theory.

24

We agree with this general proposition. *Cf. id.* at 857 n.12 (noting that, aside from the lack of evidence of the parent's and sister corporations' involvement in the defendant's conduct, there also was "no evidence that [the defendant] [wa]s merely the alter ego of its parent or sister corporations" (citation omitted)). But these theories operate independently of the single-enterprise theory. Rather than render the affiliated corporation a part of an anticompetitive enterprise, a veil-piercing, alter ego, or respondeat superior theory would hold the affiliated corporation separately and individually liable for its related corporations' conduct. And here, Lenox disclaimed reliance on any of these theories, instead insisting that its focus is on each affiliated corporation's individual contribution to the enterprise's monopolistic scheme.

As authority for alternative approaches to this question, both Lenox and Defendants point to a pair of district court cases—*Molychem*, 414 F. Supp. 2d at 1012–13, and *Nobody In Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048, 1068–71 (D. Colo. 2004)—that considered the question of when a parent corporation can be held liable for anticompetitive conduct occurring in the market in which its subsidiary competes. The district court in each case determined that a parent can be liable for subsidiary-level anticompetitive activity "if there are factual allegations . . . showing independent conduct on the part of the parent." *Molychem*, 414 F. Supp. 2d at 1012 (citing *Nobody In Particular*, 311 F. Supp. 2d at 1068–69); *see also Nobody In Particular*, 311 F. Supp. 2d at 1070 ("[L]ower courts have recognized that parent corporations can be held directly liable for independently participating in the antitrust violations of their subsidiaries."). And in each case, the court concluded that, "'[w]hen

25

the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.'" *Molychem*, 414 F. Supp. 2d at 1012 (quoting *Nobody In Particular*, 311 F. Supp. 2d at 1071).

While both sides highlight these same general passages, they interpret them differently. Defendants seize on the "control, dictate, or encourage" language and assert that Lenox cannot satisfy this standard here. Specifically, Defendants argue that absent proof each of them individually satisfied the elements of a § 2 claim or shared an alter-ego relationship with MSD USA, the *only* way they can be held liable is if they controlled, dictated, or encouraged MSD USA's anticompetitive activity.[7] Lenox, on the other hand, argues that the "control/dictate/encourage" test is merely one way that sufficient independent conduct can be established and that these district court cases stand for the broader proposition that an affiliated entity must have done *something* independently to aid or contribute to the enterprise's overall anticompetitive scheme.

---

[7] In addition to the above-referenced district court cases, Defendants rely on the Eighth Circuit's decision in *H.J., Inc. v. International Telephone & Telegraph Corp.* for the same basic propositions. *See* 867 F.2d 1531, 1549 (8th Cir. 1989) ("[The parent] cannot be held liable 'as an actor' without proof that *it* performed acts sufficient to create liability, or actively influenced [the subsidiary] in its violations. . . . Nor can [the parent] be held liable as the sole shareholder of [the subsidiary], since [the plaintiff] offered no evidence to show that [the subsidiary] was a mere instrumentality or alter ego of [the parent], or that [the subsidiary] is a sham corporation formed to shield [the parent] from liability."). But the *H.J., Inc.* court never considered whether the parent and subsidiary defendants there could be considered a single enterprise under *Copperweld*, even for purposes of the plaintiff's § 1 claim. *See id.* at 1543–45 (overturning jury's finding of Sherman Act § 1 violation based on inadequacy of evidence showing parent and subsidiary conspired, without considering whether parent and subsidiary were incapable of conspiring for purposes of § 1).

26

This, according to Lenox, aligns with its view of the proper legal test,[8] which is that each defendant must have played a "role"—or "participated"—in the anticompetitive conduct of the enterprise as a whole.[9] Lenox asserts that, under this standard, the evidence it presented is more than sufficient to support a jury finding that each defendant played a role in the enterprise's overall scheme and therefore that each defendant is liable under § 2.

The question of what must be shown in order to hold a particular affiliated corporation liable as part of an inter-corporate scheme appears to be uncharted territory at the federal circuit level. And although the parties here have argued admirably for their respective positions on this question, we leave its resolution for another day. We

---

[8] In one footnote of its opening brief and twice in its reply brief, Lenox appears to express a different view of the legal theory applicable to its antitrust claims. In these instances, Lenox essentially contends that each defendant's liability under § 2 must be assessed individually, albeit under a modified conspiracy framework. This vacillation likely reflects Lenox's awareness that it is walking a fine line doctrinally in this case between establishing enterprise liability and avoiding privity with MSD USA for purposes of claim preclusion, which we address in Part III.B.1 below. Because Lenox has not adequately briefed this potential alternative legal theory, we reject it in favor of the principles outlined in this opinion.

[9] Lenox contends this "role" test was espoused by this court in *Lenox II*, such that, aside from being proper as an objective legal matter, it also constitutes the law of the case. *See Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) (when invoked, "[l]aw of the case doctrine . . . preclud[es] the relitigation of issues either expressly or implicitly resolved in prior proceedings in the same court"). We reject this reading of *Lenox II*. In the relevant portion of that decision, we briefly addressed Defendants' implicit contention that MSD USA was solely responsible for the sham recall of Lenox's bone mill, observing that Defendants "appear[] to assume . . . [they] had no role in the recall." *Lenox II*, 762 F.3d at 1128. But since the district court had not yet permitted discovery on Defendants' involvement, we concluded Defendants could not "salvage the summary judgment ruling based on [their] assumption that none of [them] played a role in the recall." *Id.* Viewed in context, it is apparent that we used the word "role" as a generic descriptor and that we were not announcing any substantive legal test of enterprise liability. *Lenox II* established neither law nor law of the case on this issue.

therefore express no opinion on the parties' proffered tests or the evidence of each defendant's individual conduct; nor do we decide whether each defendant can be held liable for the enterprise's alleged violations of § 2 under the present facts. We need not address these issues here because even if we resolved them all in Lenox's favor, the outcome of this case would be the same.

As explained, Lenox seeks to hold Defendants liable under § 2 on the theory that they are part of a single corporate enterprise that monopolized or attempted to monopolize the bone-mill market. And while Lenox did not join MSD USA as a party, its theory requires that MSD USA be recognized as a member of the enterprise. Indeed, the anticompetitive scheme Lenox has alleged was dependent upon the actions of MSD USA. Accordingly, even if we agreed with Lenox that each of the four defendants played a sufficient "role" in the Medtronic enterprise's overall scheme by engaging in conduct coordinated with but separate from MSD USA's conduct, such that Defendants all could be deemed a part of the enterprise, MSD USA would necessarily be a part of the enterprise along with them. As we now explain, it is this inescapable fact—that Lenox's ability to succeed on its antitrust claims hinges on treating one or more Defendants and MSD USA as a single entity—that leads to the conclusion that Lenox's antitrust claims are barred under the doctrine of claim preclusion.

### B. *Claim Preclusion*

"The doctrine of res judicata, or claim preclusion, will prevent a party from litigating a legal claim that was or could have been the subject of a previously issued final judgment." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005). "The

28

principle underlying the rule of claim preclusion is that a party who once has had a chance to litigate a claim before an appropriate tribunal usually ought not have another chance to do so." *Stone v. Dep't of Aviation*, 453 F.3d 1271, 1275 (10th Cir. 2006) (citation omitted). To apply claim preclusion, "three elements must exist: (1) a [final] judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *King v. Union Oil Co. of Cal.*, 117 F.3d 443, 445 (10th Cir. 1997). In addition, even if these three elements are satisfied, there is an exception to the application of claim preclusion where the party resisting it did not have a "full and fair opportunity to litigate" the claim in the prior action. *MACTEC*, 427 F.3d at 831 & n.6.

Lenox does not dispute Defendants' assertion that the first and third elements are satisfied here, and neither do we. The arbitration award, followed by a voluntary dismissal with prejudice of the prior federal litigation, was a final judgment on the merits. *See id.* at 831 ("[A] valid and final award by arbitration generally has the same effect under the rules of res judicata as a judgment of a court."); *see also Brooks v. Barbour Energy Corp.*, 804 F.2d 1144, 1146 (10th Cir. 1986) (holding voluntary dismissal with prejudice after settlement was final judgment on merits). And there is "identity of the cause of action in both suits" because Lenox's claims here and in the prior proceeding arise from the same underlying events. *See Nwosun v. Gen. Mills Rests., Inc.*, 124 F.3d 1255, 1257 (10th Cir. 1997) ("This circuit embraces the transactional approach to the definition of 'cause of action.' Under this approach, a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence."

29

(footnote and citation omitted)); *Plotner v. AT&T Corp.*, 224 F.3d 1161, 1170 (10th Cir. 2000) ("The fact that [plaintiff] now presents some of her claims under the rubric of slightly different legal theories . . . does not obscure the fact that they all arise out of a single transaction."). Rather, the parties' disagreement revolves around the "identity of parties or privies" element and the "full and fair opportunity to litigate" exception.[10] We address each of these topics in turn.

### 1. Privity

Generally, claim preclusion requires that the named parties in the first and second suits be identical. *Pelt v. Utah*, 539 F.3d 1271, 1281 (10th Cir. 2008). Thus, even where a plaintiff has already sued one or more parties liable for a particular loss, the plaintiff ordinarily is entitled to bring another suit against a new defendant, or defendants, based on the same loss. *United States v. Lacey*, 982 F.2d 410, 412 (10th Cir. 1992); *McClelland v. Facteau*, 610 F.2d 693, 695 n.1 (10th Cir. 1979). But an exception to this rule applies when there is "privity" between the defendant(s) bound by the first suit and the new defendant(s) named in the second suit. *See Pelt*, 539 F.3d at 1281; *see also Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995) ("It is well settled . . . that claim preclusion may be invoked by and against those in privity with parties."); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4407, at 153–56 (2d ed. 2002) [hereinafter Wright & Miller] ("A single

---

[10] Although the district court stated that "Lenox does not dispute that it had a full and fair opportunity to litigate its claims in the prior arbitration," Lenox contends it did dispute this point below, and it continues to dispute it on appeal. Our review of the record convinces us that Lenox adequately preserved this issue in the district court.

plaintiff . . . has as many causes of action as there are defendants to pursue, . . . subject to the constraint that claim preclusion may be invoked by a person in 'privity' with a former defendant . . . ." (footnote omitted)).

Despite its long pedigree in the law, *see, e.g.*, *Cromwell v. Cty. of Sac*, 94 U.S. 351, 352 (1876), privity remains "an elusive concept," *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993). This court has recognized, for instance, "that no definition of privity can be automatically applied in all cases involving the doctrine of res judicata." *Pelt*, 539 F.3d at 1281 (internal quotation marks omitted). And today, "privity" often is used simply "to express the conclusion that nonparty preclusion is appropriate on any ground." *Id.* (quoting *Taylor v. Sturgell*, 533 U.S. 880, 894 n.8 (2008)); *see also* 18A Wright & Miller, *supra*, § 4449, at 351 ("[I]t has come to be recognized that the privity label simply expresses a conclusion that preclusion is proper."). But even so, the term pervades federal jurisprudence, and the standards and substantive relationships to which courts have associated it guide our analysis.

Although this court has addressed, and found, privity in a variety of corporate contexts, *see, e.g.*, *Fox v. Maulding*, 112 F.3d 453, 459–60 (10th Cir. 1997) (corporation and its officers and directors); *Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1275 (10th Cir. 1995) (subsidiary and its "controlling" parent); *Lowell Staats Mining Co. v. Phila. Elec. Co.*, 878 F.2d 1271, 1276 (10th Cir. 1989) (corporation and its agent); *Circle v. Jim Walter Homes, Inc.*, 654 F.2d 688, 689, 692 (10th Cir. 1981) ("subsidiary assignee" and its sister-subsidiary and parent), we have not yet considered whether privity exists in the precise circumstances presented here—i.e., between one member of

31

an anticompetitive enterprise and the enterprise's other members. Lenox points to this dearth of precise precedent, arguing that our prior cases support finding privity between related but legally distinct entities only where there is an assignee-assignor or alter-ego/control relationship. In Lenox's view, the evidence here reveals no such relationship between Defendants and MSD USA, thereby precluding a finding of privity. But we do not read our precedent so restrictively. And under the present facts we have little difficulty concluding privity exists.

Whatever the outer boundaries of privity may be, this court has long held that "[a]t a minimum, privity requires a showing that the parties in the two actions are 'really and substantially in interest the same.'" *Lenox II*, 762 F.3d at 1119 (quoting *Pelt*, 539 F.3d at 1281); *see also, e.g.*, *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1174 (10th Cir. 1979). As the above discussion demonstrates, the viability of Lenox's antitrust claims depends on its ability to treat Defendants and MSD USA as a *single entity*, which Lenox has attempted to do since it initiated the earlier litigation against MSD USA. Thus, the crux of Lenox's theory of liability is not just that Defendants and MSD USA are "substantially in interest the same," *Lenox II*, 762 F.3d at 1119, but that, functionally, they must be treated as *actually the same*. *Cf. In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 17–19 (1st Cir. 2003) (finding privity between two parties—which were either a parent and its subsidiary or sister subsidiaries—for purposes of defensive claim preclusion where they "were treated as a single entity" or "as peas in a pod" in the prior litigation). That is, by aggregating Defendants' and MSD USA's actions into the unitary conduct of a single entity, and by evaluating that unitary conduct for

32

purposes of antitrust liability, Lenox's theory treats Defendants and MSD USA as the same entity and seeks to hold them liable for the same conduct.

This court previously has found privity in analogous circumstances, outside the antitrust context. In *Robinson v. Volkswagenwerk AG*, plaintiffs brought and lost a products liability case against a subsidiary and then filed a second products liability case against the subsidiary's parent on the theory that the parent "had a controlling relationship with" the subsidiary. 56 F.3d at 1275. As here, we did not resolve the plaintiffs' contention that the asserted relationship actually rendered the parent liable on the merits because we concluded that, even "[i]f true, . . . this 'near alter ego' relationship would be sufficient to establish 'privity' between the two corporations such that [the parent] is entitled to assert the previous judgment as a bar to the claim now asserted." *Id.* Contrary to Lenox's contentions, *Robinson* is not wholly inapposite simply because the relationship alleged there was "controlling." Regardless of the precise relationship asserted, *Robinson* supports the proposition that if the parties were functionally or "near[ly]" acting as one, then they are in privity, such that a final judgment against one bars a subsequent action against the other for the same injury. *See id.* Such is the situation here.[11]

---

[11] Numerous other circuits have found privity between related corporations without a concomitant finding of alter-ego status or an otherwise controlling relationship. *See, e.g.*, *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d 348, 353 (5th Cir. 2009) (finding relationships among various entities involved in same large-scale farming enterprise "sufficiently close to bind all of them . . . to the judgment in the [prior action]," without describing nature of relationships); *Anchor Glass Container Corp. v. Buschmeier*, 426 F.3d 872, 879–80 (7th Cir. 2005) (finding privity between parent and previously sued subsidiary based on parent's ownership of subsidiary and fact that

Our decision in *Robinson* also undermines Lenox's attempt to discount the inherent conflict between its assertions that Defendants' corporate independence must be respected for privity purposes but disregarded for antitrust-liability purposes. Acknowledging this discord, Lenox contends that, under *Copperweld*, it is appropriate to ignore parties' legal separateness when assessing Sherman Act liability, but that it is inappropriate to do so outside that context. But in *Robinson*, we identified the assumption integral to the plaintiff's theory of liability and applied it with equal force for purposes of assessing privity. *See* 56 F.3d at 1275. It is therefore irrelevant whether Lenox is correct

subsidiary's executives acted on behalf of or in interest of parent); *In re Colonial Mortg. Bankers Corp.*, 324 F.3d at 18–19; *Mars Inc.*, 58 F.3d at 619; *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 966 (3d Cir. 1991); *Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 & n.2 (6th Cir. 1991) (finding privity between corporation named as a party in prior arbitration and two of its sister subsidiaries; and noting defendants' argument that entities had "close affiliation, joint legal representation and identity of interests"); *In re Teltronics Servs., Inc.*, 762 F.2d 185, 191–92 (2d Cir. 1985) (finding privity between various corporate entities involved in successive lawsuits, seemingly on the basis of common ownership alone). *See also* 18A Wright & Miller, *supra*, § 4460, at 639 ("Corporate parents and subsidiaries have been found in privity so as to enable one to assert claim preclusion against a plaintiff who had already [brought] an action against the other.").

In fact, several circuits have determined that where, as here, closely related defendants are sued by the same plaintiff and the subsequent defendant seeks to invoke claim preclusion based on the earlier judgment, traditional privity is not necessary. *See, e.g.*, *FleetBoston Fin. Corp. v. Alt*, 638 F.3d 70, 80–81 (1st Cir. 2011) ("We, along with other circuits, have long held that claim preclusion applies if the new defendant is closely related to a defendant from the original action—who was not named in the previous law suit, not merely when the two defendants are in privity." (quoting *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 17 (1st Cir. 2010))); *Midcontinent Broad. Co. v. Dresser Indus., Inc.*, 669 F.2d 564, 567 (8th Cir. 1982) ("[W]here, as here, the parties have such a close relationship, bordering on near identity, they are for purposes of res judicata the same parties."); *Gambocz v. Yelencsics*, 468 F.2d 837, 840–41 (3d Cir. 1972). *See also* 47 Am. Jur. 2d *Judgments* § 577 (noting that "[c]ourts have applied nonmutual res judicata where there existed a close or significant relationship between defendants in the first action and defendants in the second action who are asserting res judicata against the same plaintiff," and referring to this standard as "privity-like").

34

that *Copperweld*'s single-entity rule cannot be invoked outside the context of an antitrust case, because Lenox *did* invoke it in *this* antitrust case. Having done so, Lenox cannot now "have it both ways: either [Defendants and MSD USA] are in privity with one another for both liability and res judicata purposes, or they are not in privity for either purpose." *See R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 186 (1st Cir. 2006) (analyzing privity under Puerto Rico res judicata statute, which is construed "pragmatically"); *see also id.* ("[W]e do not see how [the sister subsidiary] and [the parent] can be tied so closely to [another subsidiary named in the prior action] for purposes of the counterclaim and yet, at the same time, be considered distinct from [that other subsidiary] for purposes of the res judicata analysis."); *Futura Dev. Corp. v. Centex Corp.*, 761 F.2d 33, 43–44 (1st Cir. 1985) (similar); *cf. Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 195 (1963) (Brennan, J., concurring) ("[A party] cannot have it both ways in the same case.").

In sum, we agree with Defendants that, if Lenox is correct that Defendants were operating as a single entity for antitrust purposes, they are in privity with MSD USA. As a result, that element of claim preclusion is satisfied. *See King*, 117 F.3d at 445. We now turn to the parties' dispute over the "full and fair opportunity to litigate" exception to claim preclusion.

### 2. Full and Fair Opportunity to Litigate

As noted above, even where the requisite elements of claim preclusion are present, its application is inappropriate if "the party seeking to avoid preclusion did not have a full and fair opportunity to litigate the claim in the prior suit." *MACTEC*, 427 F.3d at 831

35

(internal quotation marks omitted). This narrow exception applies only where the requirements of due process were not afforded, *see Crocog Co. v. Reeves*, 992 F.2d 267, 270 (10th Cir. 1993)—where a party shows "a deficiency that would undermine the fundamental fairness of the original proceedings," *Nwosun*, 124 F.3d at 1257 (citation omitted). *See also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 39 (1st Cir. 1998) ("[A]s long as a prior . . . judgment is procured in a manner that satisfies due process concerns, the requisite 'full and fair opportunity' existed."); 18 Wright & Miller, *supra*, § 4415, at 366 (opining that full and fair opportunity exception "mean[s] no more than that claim preclusion cannot arise from proceedings that deny due process"). The fairness of the prior proceeding "is determined by examining any procedural limitations, the party's incentive to fully litigate the claim, and whether effective litigation was limited by the nature or relationship of the parties." *Nwosun*, 124 F.3d at 1257–58.

Here, Lenox asserts that it lacked a full and fair opportunity to litigate its § 2 monopolization and attempted monopolization claims in the prior proceeding against MSD USA. Lenox's various contentions divide loosely into two main arguments. We address and reject these arguments in turn.

Lenox first contends it did not have a full and fair opportunity to litigate its antitrust claims because it was unaware of Defendants' involvement—and thus did not know of the facts necessary to establish § 2 liability—when it filed the prior lawsuit.[12]

---

[12] Because it will not affect the outcome of this appeal, we give Lenox the benefit of the doubt and both (1) construe its brief as asserting that Defendants' involvement

36

*Cf.* 18 Wright & Miller, *supra*, § 4415, at 388 (stating that, under certain circumstances, the later filing of a new claim arising from the same transaction at issue in a prior action "may . . . be excused because the plaintiff did not know the full dimensions of the claim at the time of the first action."). But claim preclusion applies to all claims arising from the same underlying transaction "even where the new claims are based on newly discovered evidence, unless the evidence was either fraudulently concealed or it could not have been discovered with due diligence." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695 (2d Cir. 2011) (internal quotation marks omitted); *accord Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 491 (D.C. Cir. 2009); *McCarty v. First of Ga. Ins. Co.*, 713 F.2d 609, 612 (10th Cir. 1983) ("The rule against splitting causes of action serves no purpose if a plaintiff cannot reasonably be expected to include all claims in the first action."); *see also Robinson*, 56 F.3d at 1274 n.5 ("[C]oncealment of material information by a party may justify a refusal to give preclusive effect to a judgment."). And here, there is nothing to suggest these circumstances were present.

---

constitutes facts necessary to establish its § 2 claims, and (2) assume for the sake of argument that this assertion is correct. Lenox's discussion suggests, however, that its real complaint is not that its ignorance of Defendants' involvement deprived it of a fair opportunity to litigate its current *claims* in the prior proceeding, but that this lack of knowledge deprived it of a fair opportunity to litigate its current claims *against Defendants* in the prior proceeding. This focus misinterprets the nature of the preclusion inquiry once privity is established. What matters is whether Lenox had a full and fair opportunity to litigate its § 2 claims *against MSD USA*—if it did, then it is barred from later bringing those claims against MSD USA *or any entity in privity with MSD USA*. *See Lowell Staats*, 878 F.2d at 1277 ("If Smith is in privity with Nuclear, then res judicata bars claims against Smith which could have been raised in the [prior] litigation against Nuclear."); *Spence v. Latting*, 512 F.2d 93, 98 (10th Cir. 1975) ("Where a second suit between the same parties *or their privies* is on the same [transaction], the final judgment in the prior action is conclusive as to all matters which were actually litigated *as well as those which could have been litigated*." (emphases added)).

First, there is no evidence that Lenox was prevented from discovering the facts supporting its antitrust claims "by [Defendants' or MSD USA's] fraud, deception, or wrongful conduct." *See McCarty*, 713 F.2d at 613 (citation omitted). MSD USA's assertions, during discovery in the prior suit, that it was the only Medtronic entity that contracted and dealt directly with Lenox were factually accurate statements, and its resistance to providing information about PS Medical and MSD Japan was validly premised on their status as non-parties. Contrary to Lenox's implications, none of its cited examples of Defendants' and MSD USA's behavior amounts to wrongful or fraudulent conduct aimed at concealing Defendants' involvement. *Cf. Mass. Sch. of Law*, 142 F.3d at 39 ("[A]n opportunity to litigate is no less 'full' or 'fair' simply because the forum court enforces conventional limitations on pretrial discovery.").

Moreover, Lenox cannot seriously maintain that Defendants' involvement could not have been discovered with due diligence because Lenox did, in fact, discover it. *See Capitol Hill Grp.*, 569 F.3d at 491–92 (new claims were precluded where plaintiff knew of underlying operative facts during prior proceeding). While the record suggests Lenox knew of other Medtronic entities' involvement even before its claims against MSD USA were sent to arbitration, there is no dispute that, at the latest, Lenox discovered these facts during the pendency of the arbitration. Lenox is misguided in insisting that, to have had a fair opportunity to litigate, it must have known of these facts at the time it filed its original complaint.

It is true that "[t]he filing of the plaintiff's complaint frames the scope of litigation, establishing a transactional nexus into which facts and claims are fitted or

38

excluded for purposes of claim preclusion," *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1150 (10th Cir. 2006), and that, broadly speaking, claim preclusion does not bar subsequent litigation of new claims based on facts the plaintiff did not and could not know when it filed its complaint, *see Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 914 (7th Cir. 1993); *cf. Mitchell v. City of Moore*, 218 F.3d 1190, 1202–03 (10th Cir. 2000). Critically, though, if the plaintiff discovers facts during the litigation that stem from the same underlying transaction, it must supplement its complaint with any new theories those facts support. *Stone*, 453 F.3d at 1278–79; *see also id.* at 1280 ("[A] plaintiff's obligation to assert claims arising out of the same transaction continues throughout the course of the litigation." (emphasis omitted)). A subsequent lawsuit will be allowed only if the facts discovered mid-litigation give rise to "*new and independent* claims, not part of the previous transaction." *Hatch*, 471 F.3d at 1150. Put differently, "a plaintiff can[not] avoid supplementing his complaint with facts *that are part of the same transaction asserted in the complaint*, in the hope of bringing a new action arising out of the same transaction on some later occasion." *Id.*[13]

Lenox attempts to avoid the implications of these cases through its second argument in favor of the full and fair opportunity exception. According to Lenox, it could not have added its § 2 claims when it discovered Defendants' involvement because, at

---

[13] The Seventh Circuit case Lenox relies on—*Doe v. Allied-Signal, Inc.*—does not provide otherwise. *See* 985 F.2d at 914–15 (holding that first action for negligent failure to keep plaintiff safe from rape at workplace was distinct from subsequent action based on employer's misrepresentation of plaintiff's employment status because facts forming basis of second action arose from different transaction and damages asserted in second action did not accrue until first action ended).

that time, it "was deep in the arbitration against MSD USA" and the arbitrators "had no jurisdiction over claims between Lenox and Defendants." Again, we are not persuaded.

"Essential to the application of the doctrine of res judicata is the principle that the previously unlitigated claim to be precluded could and should have been brought in the earlier litigation." *Plotner*, 224 F.3d at 1170 (quoting *D-1 Enters., Inc. v. Commercial State Bank*, 864 F.2d 36, 38 (5th Cir. 1989)). And as Lenox notes, it follows from this principle that the preclusion doctrine will not later bar a claim an arbitration panel did not have jurisdiction to hear. *See Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992); 18B Wright & Miller, *supra*, § 4475.1, at 510–11 ("If the arbitrator lacked authority to entertain the matters advanced in the later litigation, claim preclusion does not apply.")

But Lenox argues only that the arbitration panel lacked jurisdiction over Defendants. Lenox does not contend that the panel lacked jurisdiction over Sherman Act claims or that Lenox could not have brought its present § 2 claims against MSD USA alone. And as we noted above, *see supra* note 11, these are the relevant considerations in assessing the full and fair opportunity exception. *See Nwosun*, 124 F.3d at 1257 ("Res judicata . . . requires that the party had a full and fair opportunity to litigate *the claim* in the prior suit." (emphasis added)); *see also Lowell Staats*, 878 F.2d at 1277 ("If Smith is in privity with Nuclear, then res judicata bars claims against Smith which could have been raised in the [prior] litigation against Nuclear.").

Moreover, even if we determined the arbitration panel did not have jurisdiction over Lenox's antitrust claims and credited Lenox's belief that it could not have had a fair

opportunity to litigate those claims if it was unable to join Defendants as parties, we still would conclude preclusion is proper. In this case, the role of the arbitration panel is a mere distraction. Lenox initiated the prior proceeding against MSD USA in *federal court*, and the federal action was administratively closed and stayed while the parties participated in arbitration. When the arbitration concluded, the federal action remained pending, and it was not until Lenox and MSD USA *jointly agreed to a voluntary dismissal with prejudice* that the federal action came to an end. Thus, regardless of the arbitration, Lenox could have sought to amend its complaint to add its § 2 antitrust claims and to join Defendants as parties at any time during or after the arbitration proceeding but before agreeing to dismiss the federal action, *with prejudice*. *See Katz v. Gerardi*, 655 F.3d 1212, 1215–16 (10th Cir. 2011) (recounting complex procedural history involving multiple motions to amend complaints during arbitration, which added claims and parties and required court to administratively reopen cases during, and reclose them pending, arbitration of discrete claims). Lenox has not alleged that the district court in the original proceeding lacked jurisdiction over Defendants or over Lenox's claims under § 2 of the Sherman Act, nor could it.

We therefore reject Lenox's contention that it was jurisdictionally barred from bringing its § 2 claims in the prior proceeding and for that reason lacked a full and fair opportunity to litigate those claims. *Cf. MACTEC*, 427 F.3d at 832 (rejecting plaintiff's full-and-fair-opportunity argument even where prior proceeding was initiated in arbitration and arbitrator was jurisdictionally barred from considering plaintiff's theory because plaintiff had opportunity to assert theory in subsequent application to district

41

court to vacate arbitral award); *Katz*, 655 F.3d at 1219 n.5 (concluding that, where motion to amend was granted in one case, plaintiff's argument that it "cannot pursue its amended complaint in the other [parallel] case because it is administratively closed until arbitration is completed . . . is not a valid reason to ignore [plaintiff's] claim splitting"). Seeing no other indication of "a deficiency that would undermine the fundamental fairness of" Lenox's litigation with MSD USA, we conclude Lenox was afforded a full and fair opportunity to litigate its antitrust claims. *See Nwosun*, 124 F.3d at 1257. Accordingly, because the requisite elements of claim preclusion are satisfied, Lenox's claims are barred. *See MACTEC*, 427 F.3d at 831.

## IV. CONCLUSION

Lenox was entitled to pursue its § 2 monopolization and attempted monopolization claims under the theory that Defendants, together with MSD USA, are a single entity for antitrust purposes, and to prove the elements of those claims based on the collective conduct attributable to the enterprise as a whole. However, if Lenox prevailed in establishing that Defendants and MSD USA were acting as a single enterprise, it would necessarily also establish privity between Defendants and MSD USA for purposes of claim preclusion. And because the remaining requirements of preclusion are satisfied,

Lenox's claims in this case are barred. We therefore AFFIRM the district court's grant of

summary judgment for Defendants, but do so on different grounds.[14]

---

[14] Lenox initially filed an unopposed motion to seal Volume VIII of the Joint
Appendix, which consists of thirteen documents filed under seal in the district court
pursuant to a protective order. This court issued an order requesting additional
justification to seal, and, in its response, Lenox abandoned its request to seal the
documents. Responding to the same order, Defendants requested that only two of the
thirteen documents remain sealed: a 2013 motion (JA 1481–1562) and an expert's
declaration (JA 1460–80). Defendants asserted that these two documents contain
sensitive business information of Defendants and third-parties.

We have reviewed these documents and agree. "[A] party may overcome the
presumption in favor of public access to judicial records by demonstrating the [portions
of the record] contain sources of business information that might harm a litigant's
competitive standing." *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1162 n.8
(10th Cir. 2016) (internal quotation marks omitted). "And the public's interest in access
to judicial records is lessened when the contents are not used to determine the litigant's
substantive legal rights." *Id.* (alteration and internal quotation marks omitted). Because
these two documents contain proprietary business information not only of Defendants but
of non-parties, comprise a small portion of the overall record, and play no role in our
resolution of this appeal, we grant the motion to seal as to these two documents. *See id.*;
*AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1057 n.1 (10th Cir. 2008).