FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARANDELL CORP.; BRIGGS AND STRATTON CORPORATION; CARTHAGE COLLEGE; LADISH CO., INC.; MERRICK'S INC.; SARGENTO FOODS, INC., *Plaintiffs-Appellants*, | No. 16-17099 D.C. No. 2:03-cv-01431- RCJ-PAL |
| v. | OPINION |
| CENTERPOINT ENERGY SERVICES, INC., *Defendant-Appellee.* | |

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Senior District Judge, Presiding

Argued and Submitted February 16, 2018
San Francisco, California

Filed August 6, 2018

Before: Carlos T. Bea and N. Randy Smith, Circuit Judges,
and Robert S. Lasnik,[*] District Judge.

Opinion by Judge Bea

---

[*] The Honorable Robert S. Lasnik, Senior District Judge for the Western District of Washington, sitting by designation.

## SUMMARY[**]

### Antitrust Law

The panel reversed the district court's summary judgment in favor of CenterPoint Energy Services, Inc. ("CES"), a natural gas company, in a class action alleging that ten large natural gas companies colluded to fix retail natural gas prices in Wisconsin.

CES was a wholly owned subsidiary of Reliant Energy, Inc. The plaintiff class alleged that certain Reliant entities – including CES – conspired with other natural gas conglomerates to fix retail natural gas prices.

The panel held that *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), supported the following rule: a wholly-owned subsidiary that engaged in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single "economic unit" of which it was a part.

The panel held that plaintiffs raised a triable issue of CES's anticompetitive intent. Specifically, the panel held that: plaintiffs submitted evidence that Reliant's "economic unit" had an anticompetitive purpose during the class period; such anticompetitive "purpose" could sustain liability under the federal Sherman Act with or without an additional finding of knowledge; and Reliant's alleged illegal purposes are imputed to CES's coordinated activities.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that plaintiffs' evidence was sufficient to raise a triable issue of whether CES knowingly acted to further the alleged price-fixing scheme.  The panel further held that any knowledge of the alleged price-fixing scheme that CES's directors and officers acquired while concurrently acting as directors or officers of the other Reliant companies was imputable to CES as a matter of Wisconsin law.

The panel held that plaintiffs submitted sufficient evidence to raise a genuine issue under the Sherman Act – and Wisconsin Statute § 133.03(1) – as to whether CES participated in coordinated activity in furtherance of the alleged inter-enterprise price-fixing conspiracy.

## COUNSEL

Ryan M. Billings (argued), Amy Irene Washburn, Melinda A. Bialzik, and Robert L. Gegios, Kohner Mann & Kailas S.C., Milwaukee, Wisconsin, for Plaintiffs-Appellants.

Mark Russell Robeck (argued) and Travis G. Cushman, Kelley Drye & Warren LLP, Washington, D.C. for Defendants-Appellees.

**OPINION**

BEA, Circuit Judge:

Here we have a wholly owned subsidiary company which sold natural gas to Plaintiffs. It asserts that it acted innocently and without knowledge of its parent company's price-fixing scheme, which had pumped up the price of that gas. Yes, the subsidiary company sold the gas at prices previously rigged by the parent, and yes, the subsidiary sent the profits back to the parent. But the subsidiary asserts there is no evidence that *it* knew the prices were inflated or that *it* had the purpose to carry out the price-fixing scheme. Under Wisconsin antitrust law, can the subsidiary be liable to Plaintiffs? Because Supreme Court precedent establishes that "a parent and a wholly owned subsidiary *always* have a 'unity of purpose'" and thus act as a "single enterprise" whenever they engage in "coordinated activity," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) (emphasis added), we conclude that it can.

## I.  BACKGROUND

Most consumers of natural gas in North America are individuals or small businesses who buy their gas from local utility companies. However, some larger and more sophisticated businesses bypass their local utility and purchase gas directly from the companies that sell gas to the local utilities. These large commercial customers enter contracts to buy agreed-upon quantities of gas and take delivery via high-volume gas pipelines. While these contracts typically specify the quantity to be delivered, the price is typically left to be determined by reference to the market price at the time of delivery, as reported in the latest price index published by a designated trade publication. For example, a contract might provide that the price of a delivery

of natural gas would be "the *Inside FERC* index plus $x$." Such contracts to purchase gas on the cash market and take physical delivery of natural gas are referred to as "physical" contracts (as opposed to financial or "futures" contracts).[1]

In the early 2000s, natural gas prices rose dramatically, due in part to manipulative trading practices of some of the nation's largest natural gas conglomerates. In March 2003, the Federal Energy Regulatory Commission (FERC) published a report on "whether and, if so, the extent to which California and Western energy markets were manipulated during 2000 and 2001." *See* FERC, *Final Report on Price Manipulation in Western Markets: Fact-Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices*, at ES-1 (Mar. 2003), available at https://www.ferc.gov/legal/maj-ord-reg/land-docs/PART-I-3-26-03.pdf ("FERC Final Report"). The report "found significant market manipulation" by gas marketing companies such as Enron, for example. *Id.* at ES-1–ES-2. In particular, FERC discovered widespread "efforts to manipulate price indices compiled by trade publications"

---

[1] To protect against the risk that the price of natural gas will increase before the delivery date, many sophisticated gas purchasers seek to "hedge" by purchasing natural gas futures contracts—standardized contracts for the sale and purchase of natural gas at a specific price in the future—which are resolved financially (*i.e.*, by selling the contractual interest for cash or otherwise liquidating the gas interest) rather than by taking delivery of gas. A properly executed hedging strategy negates any loss or gain on the physical purchase due to changes in the price of gas, as the physical gas customer stands in the position of a natural gas *seller* for purposes of the futures contract. Ideally, the "buy" position on the physical contract and the "sell" position on the futures contract counterbalance each other so that the physical gas purchaser is left with a net cost for natural gas equal to the price of natural gas *at the time it entered the physical gas contract*.

primarily through "[r]eporting of false data" to the trade publications, "wash trading,"[2] and a trading activity known as "churning."[3] *Id.* at ES-1–ES-5. The report determined that energy trading companies had few, if any, internal controls in place to ensure the accuracy of the data reported to trade publications. *FERC Final Report* at III-3. Ultimately, the report found that price manipulation was a substantial cause of "[d]ysfunctions in the natural gas market" which led to "extraordinary" increases in gas prices in 2000 and 2001. *Id.* at ES-1.

Various plaintiff groups filed class-action lawsuits around the country, in both state and federal courts, and alleged that natural gas traders manipulated the price of natural gas by reporting false information to price indices published by trade publications and engaging in wash sales. *See In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 727 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). These actions

---

[2] A "wash trade" is "a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change in beneficial ownership. These trades expose the parties to no monetary risk and serve no legitimate business purpose." Such trades were alleged to have "exaggerated market demand for natural gas and thus manipulate[d] natural gas prices."

[3] "Churning" is "a pattern of natural gas purchases and sales" wherein (a) the gas marketing companies "both bought and sold during the trading interval, so that the trades largely offset each other," (b) "gross trading volume greatly exceeded net trading volume," and (c) the companies "made a relatively large number of consecutive purchases and/or sales in a short amount of time, often being the only buyer and/or seller during the burst of transactions." "Churning" allegedly enabled the companies to "artificially manipulate the day's average price by initially buying (which raised the prices), and then selling (which brought prices back down)."

were eventually consolidated into a multi-district litigation proceeding in the District of Nevada, *In re W. States Wholesale Nat. Gas Antitrust Litig.*, MDL No. 1566 (the "MDL"); *see also In re W. States*, 715 F.3d at 727. The MDL includes the instant action.

Plaintiffs (collectively known in the MDL below as the "Arandell Plaintiffs") filed this action in Wisconsin state court on December 15, 2006, on behalf of a proposed class of "all industrial and commercial purchasers of natural gas" who purchased natural gas "for their own use or consumption . . . in Wisconsin" between January 1, 2000, and October 31, 2002 (the "Class Period"). The defendants are ten large natural gas companies, including certain of their subsidiaries and affiliates, who allegedly colluded to fix retail natural gas prices in Wisconsin. The action was removed on the basis of diversity jurisdiction to the Western District of Wisconsin on February 9, 2007. On June 29, 2007, the case was transferred to the MDL in the District of Nevada.

This appeal is from the district court's grant of summary judgment to one defendant in the Arandell case, CenterPoint Energy Services, Inc. ("CES").[4] CES sold natural gas and related services to commercial and industrial customers in Wisconsin during the Class Period. From January 1, 2000, to August 31, 2002 (33 of the 34 months in the Class Period), CES was a wholly owned subsidiary of Reliant Energy, Inc.

---

[4] Like the parties' briefs, we refer to CenterPoint Energy Services by its current name. However, CES was known as Retail Energy Retail, Inc. during the Class Period.

("Old Reliant").**[5]**  Within the Reliant family of companies, CES dealt primarily with Reliant Energy Services, Inc. ("RES" and together with Old Reliant and the other Reliant co-defendants collectively "Reliant"), a commonly owned affiliate during most of the Class Period.**[6]**  Reliant has admitted to engaging in wash trades during the Class Period and has reached settlements with several government agencies regarding its manipulative trading practices during that time.

In this action, Plaintiffs alleged that certain Reliant entities—including CES, Old Reliant, and RES—conspired with other natural gas conglomerates to fix retail natural gas prices in Wisconsin.  Plaintiffs further alleged that CES in particular sold natural gas in Wisconsin at prices that were artificially inflated as a result of the price-fixing conspiracy between Reliant and other, non-Reliant co-conspirators.  Plaintiffs alleged two causes of action under Wisconsin's

---

**[5]** From January 1, 2000, to August 31, 2002, CES was a wholly owned subsidiary of Reliant Energy Resources Corp., which, in turn, was a wholly owned subsidiary of Old Reliant.

**[6]** During the Class Period, Old Reliant was in the process of restructuring its business pursuant to a plan filed with the Texas Public Utility Commission as required by Texas law.  From January 1, 2000, to January 1, 2001 (the first year of the Class Period), CES and RES were both wholly owned subsidiaries of RERC, which was itself wholly owned by Old Reliant.  The first phase of the restructuring was completed on January 1, 2001 (one year into the Class Period).  After January 1, 2001, Old Reliant owned 83% of RES (through a new company, Reliant Resources Inc.), while CES remained wholly owned (through RERC).  Reliant completed the restructuring one month before the end of the Class Period.  As of September 30, 2002, the restructuring of Old Reliant resulted in two independent, publicly traded companies: Reliant Resources, Inc. ("New Reliant"), which owned RES, and CenterPoint Energy, Inc., which owned CES.

antitrust statutes, seeking (1) a declaratory judgment that certain natural gas contracts made during the Class period are void under Wisconsin Statute § 133.14, and (2) treble damages for violations of Wisconsin Statute § 133.03, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal."

In the MDL, the district court granted CES's motion for summary judgment against the Plaintiffs' Third Amended Complaint ("TAC").  CES argued that it was entitled to summary judgment because it was "not alleged to have engaged in any anticompetitive activity or other wrongdoing in or directed to Wisconsin," but rather it was alleged only to have been affiliated with RES and to have sold gas to Wisconsin consumers.  The district court agreed that Plaintiffs had not raised a genuine issue of material fact sufficient to support a verdict or judgment under Wisconsin Statute § 133.03(1) because there was "no evidence" that CES knowingly "participated in a conspiracy or direct acts in restraint of trade."  In particular, the court ruled that there was no evidence that CES "knowingly" engaged in swaps "in conspiracy with RES" for "the purpose of increasing the price of natural gas," or that CES "knew that RES or others were engaged in such behavior."

On appeal, Plaintiffs summarized their case against CES as follows:

> CES (formerly a Reliant company) made an essential contribution to the Reliant companies' coordinated price-fixing efforts. Each Reliant company played a necessary role. The Reliant trading company (RES) inflated retail natural gas prices through manipulative trading and false reporting of

> sales data to publishers of benchmark price indices. RES then sold gas at inflated prices to CES, the Reliant sales subsidiary. CES resold the overpriced gas to Wisconsin businesses, collected millions of dollars in overcharges at the expense of the class members, and funneled the revenues from these sales to the Reliant parent. The officers and directors of the Reliant parent orchestrated this scheme, directing RES to manipulate retail prices and instructing CES to send its illegal profits to the Reliant parent.

Plaintiffs argue the district court erred in: (1) determining that Plaintiffs needed to produce evidence that CES intentionally conspired with RES to inflate gas prices in order to raise a triable issue, (2) failing to consider record evidence that CES purposely or knowingly furthered the alleged inter-enterprise conspiracy by selling gas at rigged prices and channeling the proceeds to Old Reliant, and (3) granting summary judgment without considering the Plaintiffs' Rule 56(d) motion for additional discovery.

## II. DISCUSSION

We review the district court's grant of summary judgment *de novo*. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). For purposes of summary judgment, CES does not contest the

substance of Plaintiffs' evidence that one or more of the other Reliant entities successfully conspired with non-Reliant entities to manipulate gas prices during the Class Period, or that CES bought gas from RES and sold it to consumers in Wisconsin during the Class Period. Therefore, the question before the court is whether Plaintiffs submitted sufficient evidence to raise triable issues as to (1) whether CES had the requisite intent and purpose to restrain trade, and (2) whether CES did in fact act to further the alleged conspiracy. We address each in turn.

## A.  Anticompetitive Intent

Wisconsin courts' interpretation of Wisconsin Statute § 133.03 "is controlled by federal court decisions under the Sherman Act." *Ford Motor Co. v. Lyons*, 405 N.W.2d 354, 367 (Wis. Ct. App. 1987). Section 1 of the Sherman Act provides that "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A defendant may be held "liable under § 1 of the Sherman Act if that person . . . [acted] either with the knowledge that the . . . [action] would have unreasonable anticompetitive effects or with the purpose of producing those effects." *United States v. Bailey*, 444 U.S. 394, 404–05 (1980). Plaintiffs argue that the evidence submitted below established that CES *purposely* participated in the price-fixing scheme because, as a wholly owned subsidiary of Reliant during the Class Period, CES is deemed to have shared the intent of the commonly owned Reliant conspirators. Plaintiffs also argue that they submitted evidence showing overlap among the directors and managers of CES, on one hand, and the alleged Reliant conspirators, on the other—creating a genuine issue of material fact as to

whether CES *knowingly* participated in the price-fixing scheme.

### 1. Purpose

Plaintiffs argue that, contrary to the district court's decision, Wisconsin antitrust law did not require them to prove "that CES knowingly engaged 'in [a] conspiracy with RES . . . with the purpose of increasing the price of natural gas" to create a triable issue as to CES's liability.  According to Plaintiffs, the "*Copperweld* doctrine"—named for the U.S. Supreme Court case *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)— establishes that "the Reliant Defendants that participated in price-fixing (CES, RES, and REI) acted as a *single* enterprise, with a shared intent."  *Copperweld*—like all federal antitrust precedents—is applicable to claims under Wisconsin Statute § 133.03.  *Lyons*, 405 N.W.2d at 367 (adopting and following *Copperweld* as a matter of Wisconsin law).

In *Copperweld*, the plaintiff alleged that Copperweld and its wholly owned subsidiary, Regal Tube Co. ("Regal"), conspired to prevent a former Regal employee from competing with Regal by threatening to sue prospective customers and financers of the former employee's new business. *Id.* at 755–58.  A jury found that Copperweld and Regal violated Section 1 of the Sherman Act, and the Seventh Circuit affirmed. *Id.* at 758.  The Supreme Court reversed. *Id.* at 777.  Rejecting "the so-called 'intra-enterprise conspiracy' doctrine," which permitted Section 1 liability between commonly owned companies, *id.* at 759, the Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1" because "[a] parent and its wholly owned subsidiary have a complete unity of

interest," *id.* at 771. Therefore, a parent company and its wholly owned subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act." *Id.* at 777. As relevant here, the *Copperweld* doctrine establishes that "[w]here there is substantial common ownership, . . . individual firms function as an economic unit and are generally treated as a single entity." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147–48 (9th Cir. 2003).

The district court was correct that, for antitrust purposes, CES did not conspire with RES; under *Copperweld*, it was incapable of doing so as a matter of law. But Plaintiffs' theory of the case is that CES was part of a "single entity"— including both RES (a commonly owned company) and Old Reliant (its parent)—which "intentionally colluded with other, *non-Reliant* conspirators to manipulate natural gas prices and profit from this manipulation."[7] Therefore, they argue, the district court should have found that *as a matter of law* it was "not possible for CES to have a different reason than [Old Reliant] and RES for participating in these efforts."

Although the Plaintiffs' application of the principles laid out in *Copperweld* is novel, we must agree. The Supreme Court stated in *Copperweld* that a parent and its wholly owned subsidiary "*always* have a 'unity of purpose or a common design.' They share a common purpose *whether or not the parent keeps a tight rein over the subsidiary*." *Copperweld*, 467 U.S. at 771 (emphasis added); *see also Freeman*, 322 F.3d at 1147–48 ("Where there is substantial

---

[7] For purposes of summary judgment, CES does not contest the substance of the evidence that Reliant successfully conspired with the other (non-Reliant) defendants and co-conspirators to manipulate retail gas prices.

common ownership, . . . individual firms function as an economic unit and are generally treated as a single entity."). The Supreme Court could have hardly made this point more explicit:

> The coordinated activity of a parent and its wholly owned subsidiary *must* be viewed as that of a *single enterprise* for purposes of § 1 of the Sherman Act.  A parent and its wholly owned subsidiary have a *complete unity of interest*. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.

> . . . [I]n reality a parent and a wholly owned subsidiary *always* have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Copperweld*, 467 U.S. at 771–72 (emphases added).  This premise led the Supreme Court to conclude that a parent cannot conspire with its subsidiary, but it also leads inescapably to the corollary conclusion that, for antitrust purposes, it is legally impossible for firms within a single "economic unit" to act together in furtherance of the same

price-fixing scheme for independent and distinct purposes. True, *Copperweld* decided only that a parent and its wholly owned subsidiary could not conspire with each other for purposes of Section 1 of the Sherman Act, but "[a]s a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (quoting *Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 668 (1989) (Kennedy, J., concurring in part and dissenting in part)).    From the Supreme Court's "explications" in *Copperweld*, the corollary proposed by Plaintiffs necessarily follows:  If "a parent and a wholly owned subsidiary *always* have a 'unity of purpose'" and act as a "single enterprise" whenever they engage in "coordinated activity," then a subsidiary such as CES as a matter of law *cannot* innocently advance an anticompetitive scheme (here, by selling gas at prices rigged by Reliant and distributing the profits to Reliant) for a legitimate business purpose, while its parent and sister companies purposely advance the very same scheme (here, by rigging the prices upstream) for an illegal, anticompetitive purpose.

The Tenth Circuit, so far the only Court of Appeals squarely to consider such an application of *Copperweld*, recently reached the same conclusion in *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017).    There, the district court had granted summary judgment to the defendant on claims under Section 2 of the Sherman Act.[8] *Id.* at 1229–30.  The plaintiff in *Lenox* argued

---

[8] *Lenox* dealt with a claim under Section 2 of the Sherman Act. 847 F.3d at 1229.  Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce

that "its burden of establishing any individual defendant's liability required showing only that the defendant's conduct played a 'role' in the overall anticompetitive scheme perpetrated by the enterprise as a whole." *Id.* at 1230. The Tenth Circuit panel agreed. It held that, under *Copperweld*, the plaintiff did not need to prove that "'*specific* Defendants' independently satisfied each necessary element of the claims," because "in a single-enterprise situation, it is the affiliated corporations' collective conduct—*i.e.*, the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a [Section 2] claim." *Id.* at 1236 (emphasis in original). Therefore, the Tenth Circuit panel concluded that the plaintiff "advanced a viable, if somewhat unusual, antitrust theory." *Id.* at 1230. Ultimately, the court granted summary judgment to the defendants on the basis of claim preclusion. *Id.* at 1239. One of the companies in the "single entity" identified by the court had previously won a final judgment on the merits on claims based on the same underlying events. *See id.* at 1239–40. Applying the plaintiffs' *Copperweld* theory, claims against other defendants in the "single entity" were thus precluded. *Id.* at 1239.

Defendants cannot have the *Copperweld* doctrine both ways. It would be inconsistent to insist both (1) that two affiliates are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act because they "always" share a "unity of purpose," and (2) that one affiliate may escape liability for its own conduct—conduct necessary to accomplish the illegal goals of the scheme—by

---

among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2. However, the Tenth Circuit panel based its holding on *Copperweld*, a Section 1 case, which it held to apply equally to Section 2 cases. *Id.* at 1234.

disavowing the anticompetitive intent of the other, even where the two acted together.  *See id.* at 1236 (finding that *Copperweld* "forecloses" a result that would allow sophisticated companies to evade Section 2 liability by spreading anticompetitive schemes over multiple affiliates). In sum, *Copperweld* supports the following rule:  A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single "economic unit" of which it is a part.

Here, Plaintiffs submitted evidence that the Reliant "economic unit" had an anticompetitive purpose during the Class Period.  Such anticompetitive "purpose" can sustain liability under the Sherman Act with or without an additional finding of "knowledge," *Bailey*, 444 U.S. at 404–05; *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 446 (1978) (stating that requiring proof of both knowledge and purpose for liability under Section 1 of the Sherman Act would be "unnecessarily cumulative").  Therefore, because the Reliant enterprise's alleged illegal purposes are imputed to CES's coordinated activities, the district court erred in granting summary judgment on the basis that Plaintiffs failed to raise a triable issue of CES's intent.

### 2.  Knowledge

Furthermore, Plaintiffs' evidence was sufficient to raise a triable issue of whether CES knowingly acted to further the alleged price-fixing scheme.  Plaintiffs submitted evidence of substantial overlap, during the Class Period, between the directors and officers of CES, on one hand, and the directors and officers of Old Reliant, RES, and other commonly owned Reliant entities.  For example, it is undisputed that (1) Marc Kilbride was the Treasurer for CES from 2000 to

2002, and also the Treasurer for RES in 2000 and for RERC from 2000 to 2003, (2) David M. McClanahan served as the Chairman of CES's board of directors in 2002, after having served as the President and sole director of RERC from 2001 to 2002, and (3) Hugh Rice Kelly was the Corporate Secretary for CES in 2000, General Counsel and Corporate Secretary to Old Reliant from 2000 to 2001, and then the Corporate Secretary for RES in 2002. Plaintiffs' evidence shows a network of fast-revolving doors connecting the boardrooms and executive offices of CES and the other Reliant companies.

Any knowledge of the alleged price-fixing scheme that CES's directors and officers acquired while concurrently acting as directors or officers of the other Reliant companies is imputable to CES as a matter of Wisconsin law. *Suburban Motors of Grafton, Inc. v. Forester*, 396 N.W.2d 351, 355 (Wis. Ct. App. 1986) ("The general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of his authority, even though the officer or agent does not in fact communicate his knowledge to the corporation." (quoting 3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 790 (rev. perm. ed. 1975) (footnotes omitted and alteration in original))). Plaintiffs submitted evidence that Reliant traders engaged in manipulative trade practices at the direction of Reliant management. Plaintiffs also submitted evidence that such manipulative practices were a matter of common knowledge within Reliant. Drawing all rational inferences in favor of Plaintiffs, these facts permit a reasonable finding that CES's directors or officers acquired knowledge of Reliant's manipulative trading practices while concurrently serving as

directors or officers of other Reliant companies. *T.W. Elec.*, 809 F.2d at 631 (holding that "[i]nferences must . . . be drawn in the light most favorable to the nonmoving party" so long as "it is 'rational' or 'reasonable' and otherwise permissible under the governing substantive law"). Because such knowledge would be imputed to CES as a matter of Wisconsin law, Plaintiffs raised a genuine issue of material fact as to CES's knowledge of the alleged price-fixing scheme.

## B. Anticompetitive Acts

We next consider whether there was a genuine issue of material fact as to whether CES acted to further the alleged price-fixing conspiracy. As Plaintiffs admit, *Copperweld* speaks only of a "unity of *purpose*," 467 U.S. at 771 (emphasis added). It does not supply a theory of unbounded vicarious liability for the *acts* of legally distinct entities. Rather, *Copperweld* states that commonly-owned-but-legally-distinct entities are considered a "single entity" for antitrust purposes where they engage in "coordinated activity."[9] *See* 467 U.S. at 771 ("The *coordinated activity* of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." (emphasis added)). Thus, a subsidiary shares the purposes and intentions of the parent when it acts in

---

[9] This distinction provides a bright-line limit on an antitrust plaintiff's recovery from a particular defendant. While a "veil-piercing, alter ego, or *respondeat superior* theory" might render a defendant separately and individually liable for any conduct of its corporate affiliates, Plaintiffs' theory seeks to hold CES liable only for its own alleged anticompetitive acts. *See Lenox*, 847 F.3d at 1237. Therefore, any recovery from an affiliate under Plaintiffs' *Copperweld* corollary would be limited to damages caused by anticompetitive conduct attributable to that affiliate.

coordination with the parent, but *Copperweld* does not support holding a subsidiary liable for the parent's independent conduct.  *See Lenox*, 847 F.3d at 1237 ("[A]lthough we agree that [the plaintiff] was entitled to pursue its § 2 claims against Defendants as a single enterprise, and to prove those claims based on the actions of the enterprise as a whole, [the plaintiff] was still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise.").  As with any antitrust defendant, Plaintiffs must put forth evidence that CES engaged in anticompetitive conduct.[10]

To be liable on a Section 1 claim, a defendant must have conspired (or agreed or combined, etc.) to restrain trade.  "It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy, but it is sufficient that

---

[10] The cases cited by CES merely apply this distinction, and thus they are not contrary to Plaintiffs' "single entity" theory.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.44 (3d Cir. 2010) (noting the defendant subsidiaries were not alleged to have actually participated in the alleged bid-rigging scheme); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (rejecting "single enterprise" theory "[i]n the absence of any specific evidence of coordinated activity" and distinguished on this basis in *Lenox*, 847 F.3d at 1234); *Acuity Optical Labs., LLC v. Davis Vision, Inc.*, No. 14-cv-03231, 2016 WL 4467883, at *9 (C.D. Ill. Aug. 23, 2016) (finding no "actual evidence" of "coordinated activity"); *Vollrath Co. v. Sammi Corp.*, No. CV 85-820 MRP,1989 WL 201632, at *20–21 (C.D. Cal. Dec. 20, 1989) (finding no evidence of an *inter*-enterprise conspiracy and thus no actionable conspiracy under *Copperweld*); *cf. Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195–96 (2010) (holding that *separately owned* NFL teams were not a "single entity" under *Copperweld*).  Cases addressing veil-piercing, alter-ego, and *respondeat-superior* theories are likewise inapposite.

a concert of action be contemplated and that defendants conform to the arrangement." *Esco Corp. v. United States*, 340 F.2d 1000, 1008 (9th Cir. 1965). "[A]ny conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy." *Id.* Therefore, CES's alleged contributions to the conspiracy (selling gas to Wisconsin consumers at the inflated prices and disbursing the profits to Reliant), would be adequate circumstantial evidence of conspiracy, if proved, to permit a finding of liability.

This conclusion comports with ordinary conspiracy principles. "While particularly true of price-fixing conspiracies, it is well recognized law that any conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged." *Id.* at 1007. Thus, even in the criminal context, the government "need show neither direct contact nor explicit agreement among all of the alleged conspirators." *United States v. Reese*, 775 F.2d 1066, 1071 (9th Cir. 1985). Nor must the government show "that each defendant or all defendants must have participated in each act or transaction." *Esco*, 340 F.2d at 1006. Involvement "in but two of ten allegedly conspirational [sic] situations does not absolve [a defendant] from participation in the entire conspiracy if its involvement in the two was unlawful and knowingly and purposely performed." *Id.* at 1008. Nor can a single defendant "join a continuing conspiracy long after others have commenced it, or partially carried it out, and thereby claim immunity either for his actions, or for those of others taking place before or after his active participation, *as long as he remains an active participant*." *Id.* at 1006 (emphasis added and citation omitted). In sum, CES may be held liable for its own acts in purposeful and knowing furtherance of the alleged inter-enterprise price-fixing conspiracy, if proven.

The remaining question is whether Plaintiffs submitted sufficient evidence to raise a genuine issue as to whether CES in fact participated in coordinated activity in furtherance of the alleged inter-enterprise price-fixing conspiracy.[11] Plaintiffs submitted evidence that, during the Class Period, CES sold gas at rigged prices and then distributed the proceeds up to its parent's coffers. CES does not deny that it sold gas it purchased from RES to consumers in Wisconsin.[12] Plaintiffs also submitted evidence that the profits from CES's natural gas sales "rolled up" to Reliant and its shareholders, and that Reliant would report those distributions as revenues in its consolidated financial reports.

This evidence suffices to create a triable issue of liability under the Sherman Act, and thus it suffices under Wisconsin Statute § 133.03(1) as well. Crediting Plaintiffs' evidence, CES's role was essential to securing the benefit of the other Reliant defendants' price-fixing (at least in Wisconsin), and CES's acts were the immediate cause of Plaintiffs' injuries. *T.W. Elec.*, 809 F.2d at 631 ("If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party."). In selling gas at rigged prices and distributing the inflated

---

[11] Again, for purposes of summary judgment, CES does not contest the substance of Plaintiffs' evidence that one or more Reliant companies successfully conspired with non-Reliant defendants and co-conspirators to manipulate the prices of gas sold by CES during the Class Period. *See FERC Final Report* at ES-5 (describing churning by Reliant in 2000 and 2001).

[12] The parties dispute *how much* gas CES sold in Wisconsin, *how much* money CES received for that gas, and *how much* of that gas came from RES. These are issues for the trier of fact.

profits to its parent, CES helped to carry out the inter-enterprise conspiracy with the other gas companies (just as Reliant allegedly carried out the conspiracy by reporting sham sales to the trade publications). CES's role was not only helpful to the conspirators, it was crucial: Until CES sold the gas to consumers, the rigged and inflated prices were not passed on to buyers *outside* of the Reliant economic unit and there was no gain to the Reliant enterprise. *Cf. United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 (1940) (noting that an alleged antitrust conspiracy "would fail" if the conspirators could not charge higher prices to the "jobbers and consumers"). "[T]he conspiracy contemplated and embraced, at least by clear implication, sales to . . . consumers . . . at the enhanced prices. The making of those sales supplied part of the 'continuous cooperation' necessary to keep the conspiracy alive." *Id.*

CES argues that "sales to Wisconsin customers were unnecessary for RES to profit from the alleged conspiracy" because "RES would accrue any purported benefit of increased prices once RES's sale occurred—whether to CES or any other customer." But this argument ignores *Copperweld*'s instruction to treat RES and CES as part of a "single entity." CES's and RES's respective balance sheets may have changed when CES bought gas from RES, but the Reliant enterprise did not benefit until Reliant gas was sold to someone outside the enterprise. Reliant could not profit by moving cash from its right pocket to its left.

CES's critical contributions to the conspiracy, if proved, would permit a rational factfinder to find that CES joined the conspiracy. Because CES is deemed to have engaged in this coordinated activity with the alleged illegal purpose of its affiliates, Plaintiffs have raised a triable issue of CES's liability under Wisconsin antitrust law. Accordingly, the

district court's grant of summary judgment is reversed. Because we reverse the district court's grant of summary judgment, we need not and do not reach Plaintiffs' challenge to that order based on Rule 56(d).  *See Longoria v. Pinal Cty.*, 873 F.3d 699, 711 (9th Cir. 2017).

**REVERSED** and **REMANDED**.  Appellee's motion to supplement the record on appeal, filed April 24, 2017, is **DENIED.**